# United States Court of Appeals
## For the First Circuit

No. 02-2346

SUSAN N. KALITANI,

Petitioner,

v.

JOHN ASHCROFT, United States Attorney General,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF THE

BOARD OF IMMIGRATION APPEALS

Before

Lynch, Lipez, and Howard, <u>Circuit Judges</u>.

<u>Christopher W. Drinan</u> was on brief for petitioner.

<u>Allen W. Hausman</u>, Senior Litigation Counsel, Office of Immigration Litigation, <u>Robert D. McCallum, Jr.</u>, Assistant Attorney General, Civil Division, and <u>Emily Anne Radford</u>, Assistant Director, Office of Immigration Litigation, were on brief for respondent.

August 11, 2003

**LYNCH**, <u>**Circuit Judge**</u>.    Susan Kalitani, a native and citizen of Uganda, petitions for review of the denial of her applications for asylum, withholding of deportation, and protection under the United Nations Convention Against Torture.    We affirm.

## I.

Kalitani entered the United States on September 8, 1998, ostensibly as a visitor for pleasure.    After overstaying her visa, she applied for asylum in August 1999 and received an interview with an asylum officer, who recommended against granting asylum. The INS began removal proceedings against Kalitani on March 6, 2000.    Kalitani conceded the charge, declined to designate a country for removal, and sought asylum, withholding of deportation, relief under the U.N. Convention Against Torture ("CAT"),[1] and, in the event removal was necessary, voluntary departure.    The Immigration Judge ("IJ") held a hearing on the merits of Kalitani's case on February 12, 2001, and on the same day issued an oral opinion denying her petition.    The Board of Immigration Appeals ("BIA") issued a summary affirmance without opinion on September 27, 2002.    <u>See</u> 8 C.F.R. § 1003.1(a)(7) (2003)(formerly 8 C.F.R. § 3.1(e)(4)).    This appeal followed.

---

[1] United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.  <u>See</u> <u>generally</u> <u>Mediouni</u> v. <u>INS</u>, 314 F.3d 24, 26 n.2 (1st Cir. 2002).

Kalitani's asylum application and hearing testimony tell a dramatic and harrowing story. She testified that if she returns to Uganda, she will be killed by the government. Kalitani said that her father, Wasswa Henry Kabazzi, was a former rebel turned high-ranking military officer in Uganda when, in August 1995, soldiers abducted him from the family home. The soldiers claimed he was plotting to overthrow the government (which was controlled by the National Resistance Army). Soldiers burst into the house again at three o'clock in the morning on the same night. They searched for papers and weapons, beating family members who disclaimed knowledge of Kabazzi's activities. Kalitani, her mother, and her siblings fled to Kalitani's grandmother's home in another village, where they stayed for two weeks until soldiers discovered them hiding there. As the soldiers came in the front door of the house, Kalitani and her brother ran out the back. They took refuge in the forest and hid there for five days, unaware of what happened to the rest of the family. When they emerged from the woods, they took shelter briefly with a local priest and then sought protection from a group of rebels who were friends of their father. The rebels were members of the Lord's Resistance Army, known as the LRA.

Kalitani and her brother eventually decided to join the LRA. She lived at one of their training camps for over a year and a half, and belonged to the group for about two years in total. As

a woman, she said, she was made to cook for the rebels and help with work around the camp. She also participated in some of the group's more dangerous activities. Three times, Kalitani was sent to spy on government barracks. In addition, she was trained to use weapons, including an AK-47 assault rifle. When she left the camp in the spring of 1997, armed with an AK-47, she received a "serious" mission: to raid government barracks and set free a number of rebel prisoners. There was a firefight during the mission and Kalitani fired on government soldiers, although she insisted that she did not kill anyone. She testified that she and her brother were captured after the firefight, beaten and tortured by soldiers of the National Resistance Army, and held prisoner in an underground room for over four months. During that time, the soldiers would periodically choose prisoners to execute. She watched the soldiers execute her brother by firing squad.

Eventually, Kalitani managed to escape and she fled into the forest. A pair of strangers rescued her and delivered her to the home of a friend, where she learned that her sister and grandmother had been killed. There was no news of her mother and other sister. She stayed with her friend for nine months. Then, by bribing border officials, Kalitani made her way into Kenya, where she boarded a plane and traveled to the United States via Switzerland and Denmark. She used a Ugandan passport and a U.S. entry visa obtained for her by a person whom she variously

described as a friend of her father and as the father of a friend. She was unwilling or unable to say how this person obtained the passport or acquired the visa; Kalitani never personally visited an American consulate or embassy. When Kalitani finally arrived in Seattle on September 8, 1998, she did not reveal to U.S. immigration authorities that she was fleeing Uganda. Instead, she told them that she was simply visiting the country for pleasure, consistent with the visa in her passport. Approximately a year later, Kalitani gave birth to a daughter in the United States.

In addition to Kalitani's testimony, the IJ also considered a 1997 State Department country conditions report for Uganda that the government entered in evidence. The report confirms that while the ruling government's human rights record improved somewhat during 1996, "numerous, serious problems remain" and that "[g]overnment forces committed or failed to prevent extrajudicial killings of suspected rebels and civilians." The report also mentions the LRA, which it describes as killing, torturing, maiming, raping, and abducting large numbers of civilians; displaying the mutilated bodies of their victims; and terrorizing civilians by hacking off limbs and noses and breaking legs with hammers. In addition, the report states that the LRA "regularly abducted children of both sexes and virtually enslaved them as concubines, guards, and soldiers."

Like the interviewing asylum officer before him, the IJ found that the petitioner was simply not credible, citing specific examples in her story of inconsistencies and unlikely assertions. After reviewing her asylum application and testimony, the IJ concluded:

> The respondent's inconsistencies, which I have found [and] which are stated in the record, which the asylum officer found was not credible, which I agree with, reflect[], and I so find[,] that the respondent's testimony concerning the reasons why she is afraid to return to Uganda are not credible. . . . A reasonable person similarly situated as the respondent would not fear, based on this record[,] returning to Uganda, and I find that the respondent[, upon] returning to Uganda[,] would not be persecuted or [have] a well-founded fear of persecution for what is contained in the asylum application . . . [or] her testimony in these proceedings[,] nor for her race, religion, nationality, membership in a particular social group or political opinion. Consequently, her application for political asylum will be denied as a matter of discretion.

The IJ then denied Kalitani's requests for withholding of deportation and protection under CAT on essentially the same grounds.

## II.

The BIA's determination of an alien's eligibility for asylum "must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (internal quotation marks omitted); see Albathani v. INS, 318 F.3d 365, 372 (1st Cir. 2003). We may not disturb the decision of the BIA unless the evidence, taken as a whole, would compel any reasonable adjudicator to reach

-6-

a contrary conclusion. 8 U.S.C. § 1252(b)(4)(B) (2000). Moreover, Kalitani bears the burden of establishing her eligibility for asylum. 8 C.F.R. § 208.13(a) (2000). She may do so by showing either (1) that she has suffered past persecution on account of her race, religion, nationality, membership in a particular social group, or political opinion; or (2) that she has a well-founded fear of suffering such persecution. Id. § 208.13(b); Fesseha v. Ashcroft, 333 F.3d 13, 18 (1st Cir. 2003). Because the BIA affirmed without opinion, we review the decision of the IJ directly. Herbert v. Ashcroft, 325 F.3d 68, 71 (1st Cir. 2003).

The thrust of Kalitani's appeal is that the IJ's stated reasons for doubting her credibility were not sufficient to justify rejection of her claim. On this basis, she argues that the IJ's decision is not supported by substantial evidence, and that the IJ denied her due process of law by failing to consider all pertinent evidence. We disagree.

A review of the record reveals that there were adequate grounds for the IJ's finding that Kalitani's story was not credible. Cf. Aguilar-Solis v. INS, 168 F.3d 565, 571 (1st Cir. 1999) ("[W]hen a hearing officer who saw and heard a witness makes an adverse credibility determination and supports it with specific findings, an appellate court ordinarily should accord it significant respect."). First, there was reason to doubt petitioner's identity. She testified at the hearing that her true

-7-

name is Susan Nakiyemba, but the passport and birth certificate she produced, both procured in 1998, show her surname as Kalitani. Her explanation for the discrepancy was that the passport and birth certificate were obtained for her by another person, who added his own surname. But she inconsistently described this benefactor as "a friend of my father" and as "the father of my friend." Then, she claimed that she was issued a visa to enter the United States without ever appearing at the U.S. Embassy in Uganda or at any other American embassy or consulate, and that she was issued a Ugandan passport without a signature (which, of course, allowed her later to add one). She could not explain how her birth certificate was procured or recall why her passport bore a stamp for Kampala, Uganda. These facts suggest either that the passport and visa were fraudulently obtained or that Kalitani's story was not true. Either way, the IJ properly relied on this evidence in finding that Kalitani lacked credibility.

Second, aspects of Kalitani's testimony were inherently incredible. When Kalitani was first interviewed by the asylum officer, she incorrectly told him that an AK-47 assault rifle, a weapon that she supposedly trained to use and that she testified she had fired in the heat of battle, held only three or four rounds of ammunition.[2] The IJ also found it extremely unlikely that

_____

[2] At her hearing before the IJ, Kalitani attempted to correct this error, testifying that she had never told the asylum officer that the weapon held so few rounds. She explained that she meant

-8-

during her two years with the LRA, Kalitani participated in only one "serious" mission and that she never saw the LRA engage in any of the activities described in the country conditions report, as she had testified.

Finally, the IJ observed Kalitani's demeanor and found her evasive, less than candid, and unresponsive. The IJ even warned Kalitani during the hearing (though he certainly was not required to do so) that her credibility was an issue, and that a credibility determination would be important to his decision because she had offered no documentary or other evidence to substantiate her claims. When asked why she applied for asylum, Kalitani gave a surprisingly forthright answer that further supports the IJ's refusal to believe her tale of persecution: she said she applied for asylum because she had a baby (conceived and born in the United States) and she realized her time to be in the country legally was running out.

On this record, we cannot say that the IJ's decision was error at all, much less that the evidence <u>compelled</u> the IJ to find that Kalitani had met the standards for asylum. See <u>Elias-Zacarias</u>, 502 U.S. at 481 n.1.

Kalitani's due process claim is also without merit: her argument is not that the IJ ignored evidence; indeed, no ignored

_____

to say the weapon held three or four <u>magazines</u>, each of which contained 30 bullets.

-9-

evidence is specified. If her contention is simply that the IJ should have noted other evidence supporting her credibility, it fails. See Morales v. INS, 208 F.3d 323, 328 (1st Cir. 2000) ("Where, as here, the Board has given reasoned consideration to the petition, and made adequate findings, we will not require that it address specifically each claim the petitioner made or each piece of evidence the petitioner presented." (quoting Martinez v. INS, 970 F.2d 973, 976 (1st Cir. 1992))). Kalitani's argument boils down to an assertion that the IJ should have believed her. But the IJ was not compelled to believe her, and substantial evidence on the administrative record supports his decision not to do so.

Because Kalitani did not meet her burden to show eligibility for asylum, she necessarily also fails to establish eligibility for withholding of removal. Fesseha, 333 F.3d at 19 n.6; Mediouni v. INS, 314 F.3d 24, 27 (1st Cir. 2002). And given the IJ's justifiable doubts about Kalitani's credibility, his denial of relief under CAT is amply supported by the record. See Guzman v. INS, 327 F.3d 11, 16-17 (1st Cir. 2003) (burden is on petitioner under CAT to establish that torture is more likely than not upon removal).

**III.**

We **affirm** the decision of the BIA denying the application for asylum, withholding of removal, and protection under CAT.[3]

---

[3] Petitioner was not granted the privilege of leaving the country voluntarily and her petition does not challenge that determination.