**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to lst Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 03-1499

SAM NEANG KEO CHAN,

Petitioner,

v.

JOHN ASHCROFT, United States Attorney General,

Respondent.

ON PETITION FOR REVIEW FROM AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

Martin J. McNulty on brief for petitioner.
Peter D. Keisler, Assistant Attorney General, Terri J.
Scadron, Assistant Director, and Carol Federighi, Office of
Immigration Litigation, Civil Division, on brief for respondent.

March 30, 2004

**STAHL, <u>Senior Circuit Judge</u>**.  Petitioner-appellant Sam Neang Keo Chan applied for political asylum pursuant to 18 U.S.C. § 1158(b)(1) and withholding of removal pursuant to 8 U.S.C. §§ 1101 <u>et</u> <u>seq</u>. and 1229a.  The Immigration Judge (IJ) denied Chan's application, and the Board of Immigration Appeals affirmed that decision without opinion.  We affirm the Board's decision on the ground that it is supported by substantial evidence.

## I.    BACKGROUND

Chan, a forty-six year old native of Cambodia, last entered the United States on October 8, 1998, on a non-immigrant visa.  Despite her visa's expiring on November 6, 1998, Chan remained in the United States and on January 19, 1999, applied for political asylum and withholding of removal.

This case takes place against the turbulent political backdrop of Cambodian history.  After decades of turmoil, in 1993 the Cambodian government was established as a constitutional monarchy.  King Sihanouk was named Head of State, and Prince Ranariddh and Hun Sen served as First and Second Prime Ministers, respectively.  In July, 1997, Hun Sen overthrew Prince Ranariddh, and a period of violence ensued.  Subsequently, Hun Sen agreed to democratic elections, which he won in July, 1998.  According to State Department reports, the 1998 electoral campaign and its aftermath "were marred by protests, voter intimidation, and

partisan violence, some of it government-directed." Political stability has since been achieved through a coalition government.

Chan's application for asylum, affidavit, and hearing testimony set forth the following allegations: She was born on December 29, 1958, in Phnom Penh, Cambodia, and married Seng Hong on July 7, 1978. The couple had three children, now approximately twenty, seventeen, and eight years of age. Under the Pol Pot regime, Chan's family was forced to move from their home in Phnom Penh to the province area. Her father was taken away and presumably killed, her brother was executed, and Chan was enslaved in "the hard labor force."

In early 1998, Chan became a member of the Sam Rainsy party, a rival of Hun Sen. On April 20, 1998, Chan received her membership card and attended a meeting with her uncle, Lon Phon, a prominent leader in the Sam Rainsy party. While she stood by the door greeting some of the 200 supporters in attendance, four Hun Sen soldiers arrived on motorcycles. They fired their weapons in the air, pointed a gun at Chan's head, and threatened to kill her if the meeting continued. Fearing harm, the Sam Rainsy supporters, including Chan and Lon Phon, fled.

On July 11, 1998, Chan and four other Sam Rainsy supporters, while distributing campaign materials in a Phnom Penh marketplace, were approached by three Hun Sen soldiers. One soldier, identified by Chan as the security chief of the

marketplace, put a gun to Chan's head.[1]  He pulled the papers from her hands and warned her that she would "have a short life" if she continued to support the Sam Rainsy party.

After Hun Sen won the parliamentary elections on July 26, 1998, the leaders of the opposing parties, Prince Ranariddh and Sam Rainsy, accused Hun Sen of fraud.  Chan attended rallies where Sam Rainsy supporters declared Hun Sen a stealer, a dictator, and a Vietnamese puppet.  The political protests were particularly violent between September 7 and September 13, 1998.  Chan alleged that on September 14, 1998, thirty thousand Sam Rainsy supporters, including Chan, convened outside the United States Embassy, waving United States, Cambodian, and Buddhist flags.  Eight thousand riot police were deployed.  Chan asserted that police used guns, clubs, chains and water cannons to disperse the crowd.  Protesters were arrested, beaten, and killed, but Chan was able to escape unharmed.  She subsequently walked sixty kilometers to safety in the village of Kampong Chamlong.

The following day, Hun Sen soldiers arrived at Chan's home, apparently looking for her.  Chan's mother refused to inform the soldiers of the location of either Chan or Chan's husband, Seng Hong.  One week later, the soldiers returned and ransacked Chan's home.  Chan's mother was forced to the ground at gunpoint and

---

[1]The IJ stated, apparently in error, that the gun was placed to Chan's stomach.

-4-

asked, "Do you want to eat bullets or do you want to tell us where your children are?" Seng Hong has been missing since the September 14 demonstration, as have two of Chan's friends. Chan's uncle and his family fled the country.

Chan contends that because she is a well-known Sam Rainsy supporter, she fears she will be persecuted if she returns to Cambodia. She is also concerned for her three children; they remain in Cambodia with Chan's mother but do not attend school because Chan fears for their safety.

According to documents in the record, Chan visited the United States from June 24 to October 21, 1997, during the height of the coup. She had no affiliation with Sam Rainsy or any other political party until the following year. After the April 1998 incident involving the Hun Sen soldiers at the Sam Rainsy meeting, she traveled to China, where she remained from May 16 until May 30, 1998. On June 11, 1998, Chan again traveled to the United States and returned to Cambodia on July 5, 1998.[2]

Following the demonstration at the U.S. Embassy, Chan left Cambodia on October 7, 1998, and arrived in San Francisco the next day. On January 14, 1999, she filed an application for

---

[2]On June 9, 1998, the American Consulate in Phnom Penh issued Chan a non-immigrant visa that was valid for multiple entries until June 19, 1999. Chan contends that the visa was issued on June 19, 1997.

political asylum and withholding of removal.[3]  On May 2, 2000, an Immigration Judge heard her case.  On October 10, 2000, the IJ issued a decision denying Chan's application.  She appealed to the Board of Immigration Appeals, which affirmed the decision without opinion pursuant to 8 C.F.R. § 1003.1(e)(4).  She now seeks judicial review of the decision of the Board.

## II. DISCUSSION

In her petition for review, Chan contends that the Board erred in affirming the IJ's decision.  She claims that the IJ erroneously found her testimony not to be credible and that she adduced sufficient evidence to prove that she is both a victim of past persecution and a likely target of future persecution.

A.      Applicable law

This court reviews the Board's findings of fact and credibility under a "substantial evidence" standard.  Mediouni v. INS, 314 F.3d 24, 26 (1st Cir. 2002) (citing Yatskin v. INS, 255 F.3d 5, 9 (1st Cir. 2001)).  "Board determinations of statutory eligibility for relief from deportation, whether via asylum or withholding of deportation, are conclusive if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'"  Id. at 26-27 (quoting INS v. Elias-Zacarias, 502 U.S. 478, 480 (1992)).  Unless the applicant puts

_____

[3]Later in the proceedings, Chan added a request for protection pursuant to the United Nations Convention Against Torture.

-6-

forth evidence "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution," we will uphold a denial of asylum. Elias-Zacarias, 502 U.S. at 483-84. When the Board affirms without opinion, as it did here, we review the decision of the Immigration Judge. Quevedo v. Ashcroft, 336 F.3d 39, 43 (1st Cir. 2003).

The standard for withholding deportation is stricter than that for asylum, thus "a petitioner unable to satisfy the asylum standard fails, *a fortiori*, to satisfy the former." Mediouni, 314 F.3d at 27 (quoting Velasquez v. Ashcroft, 305 F.3d 62, 64 n.2 (1st Cir. 2002)). Accordingly, we address Chan's asylum claim first.

An asylum applicant bears the burden of proving either past persecution or a well-founded fear of future persecution. Id.; 8 C.F.R. § 208.13(b). In establishing a well-founded fear of future persecution, the applicant must prove "both a genuine subjective fear and an objectively reasonable fear of persecution" on the grounds of race, religion, nationality, membership in a particular social group, or political opinion. Mediouni, 314 F.3d at 27. An objectively reasonable fear "requires a showing 'by credible, direct, and specific evidence . . . facts that would support a reasonable fear that the petitioner faces persecution.'" Civil v. INS, 140 F.3d 52, 55 (1st Cir. 1998) (quoting Ravindran v. INS, 976 F.2d 754, 758 (1st Cir. 1992)). Here, the merits of Chan's claims rest largely on the credibility of her accounts.

B.        Past persecution

A finding of credibility is paramount in asylum cases. See Gailius v. INS, 147 F.3d 34, 45 (1st Cir. 1998). The IJ found that Chan's account of past persecution lacked the "ring of truth" necessary to credit her account of alleged persecution, pointing to discrepancies between newspaper accounts of the September 14, 1998 demonstration and Chan's account. According to Chan's testimony and asylum application, the demonstration involved thirty thousand protesters and eight thousand riot police in front of the Embassy. News sources in the record, however, assert that the demonstration began with two hundred protesters and grew to fifteen to twenty-five hundred protesters. Published articles also indicate that eight thousand Hun Sen supporters, not police, were transported to the city and that although fifty-three people have been missing since the demonstration, there were no proven deaths. The IJ concluded that this evidence contradicted Chan's testimony that she "saw people being killed and being beaten everywhere."

Chan contends that these inconsistencies are minor discrepancies that do not affect her credibility. See Wang v. INS, 352 F.3d 1250, 1253 (9th Cir. 2003) ("minor inconsistencies and minor omissions relating to unimportant facts will not support an adverse credibility finding") (quoting De Leon-Barrios v. INS, 116 F.3d 391, 393 (9th Cir. 1997)). While the discrepancies concerning the September demonstration are not overwhelming, they do concern

-8-

facts that are central to her claims.  See De Leon-Barrios, 116 F.3d at 393 (discrepancies between applications are not minor because they serve as the basis for applicant's alleged fear of persecution); see also Borjorques-Villanueva v. INS, 194 F.3d 14, 16 (1st Cir. 1999).  Under our deferential standard of review, see Kalitani v. Ashcroft, 340 F.3d 1, 5 (1st Cir. 2003), we will not disturb the IJ's determination that the discrepancies were material to her credibility.

Moreover, other elements of Chan's account undermine her claim of past persecution.  According to Chan, she was first threatened by Hun Sen soldiers on April 20, 1998, the day she received her membership card and attended a meeting of Sam Rainsy supporters.  Yet she left Cambodia for a two-week visit to China less than one month later.  She also traveled to the United States on June 11, 1998, and returned to Cambodia on July 5, 1998.[4]  In doing so, she subjected herself to inspections that typically accompany international flights.  Had she been the target of persecution, it is likely that she would have encountered some difficulty in her travels.  Moreover, had she been as frightened by the April 20 incident as she suggests, it also is likely that she would have been reluctant to return to Cambodia on both occasions.

---

[4]Chan stated that these trips were for "pleasure" when questioned about them during the hearing.

In addition, Chan continued to work at the Phnom Penh marketplace following her alleged assault by the chief of marketplace security. Such conduct is not consistent with victimization. Moreover, Chan has suffered no physical harm, an important consideration in our analysis of past persecution. See Guzman v. INS, 327 F.3d 11, 15-16 (1st Cir. 2003); Lim v. INS, 224 F.3d 929, 936 (9th Cir. 2000). We therefore hold that the IJ's conclusion that Chan failed to prove past persecution is supported by substantial evidence.

C.        Well-founded fear of future persecution

Chan also seeks to establish eligibility for asylum by adducing specific evidence justifying a well-founded fear of future persecution. See Velasquez, 342 F.3d at 58; Aguilar-Solis v. INS, 168 F.3d 565, 572 (1st Cir. 1999). She must prove that her fear is both genuine and objectively reasonable. Aguilar-Solis, 168 F.3d at 572.

Chan claims that her life was threatened on two occasions prior to the September 14 demonstration, yet she continued to live and work unharmed in Phnom Penh for nearly five months following the first threat. Chan also remained in Cambodia for more than three weeks after the September 14 demonstration. She had a valid passport and United States visa, and it is likely that she would have fled immediately had she actually believed her life was in imminent danger.

-10-

Moreover, as the IJ pointed out, Chan was one of many Sam Rainsy supporters in Cambodia. She held no position of power within the party, and indeed had not even joined until 1998. See Khem v. Ashcroft, 342 F.3d 51, 54 (1st Cir. 2003) (upholding the denial of asylum on the basis that petitioner, a Cambodian citizen, was not subject to future persecution because she was a low-level party member, never made public speeches, and never held a party office).

We also defer to the IJ's findings concerning changed conditions in Cambodia. "Changed country conditions often speak volumes about the objective reasonableness of an alien's fear that persecution lurks should he return to his homeland." Aguilar-Solis, 168 F.3d at 572. The record indicates the return of political stability to Cambodia since shortly after the September 14 demonstration. Moreover, Chan's children and mother continue to live in Cambodia; although the children do not attend school because of Chan's fears, there is no record evidence indicating that they face objective danger. "The fact that close relatives continue to live peacefully in the alien's homeland undercuts [her] claim that persecution awaits [her] return." Khem, 342 F.3d at 54 (quoting Guzman, 327 F.3d at 16). Thus, we are not compelled to find that Chan genuinely and reasonably fears future persecution in Cambodia.

D.        Chan's due process claim

Lastly, Chan contends that she was denied due process as a result of the translation services provided to her.  She asserts that the IJ was unable to adequately evaluate her demeanor -- and accordingly, her credibility -- because the translations were not immediately provided after each word, but rather were given at the conclusion of Chan's answers.

While an adverse credibility determination may be reversed in the case of an inaccurate translation, see Amadou v. INS, 226 F.3d 724, 726 (6th Cir. 2000) (applicant denied due process because translator was incompetent); Perez-Lastor v. INS, 208 F.3d 773, 777-78 (9th Cir. 2000) (asylum applicant was prejudiced by incompetent translation), Chan makes no such claim here.   Rather, she merely argues that she was generally disadvantaged by the manner in which her testimony was translated. There is no indication that any such objections were made at the asylum hearing.  See Albathani v. INS, 318 F.3d 365, 375 (1st Cir. 2003) (affirming the Board's denial of asylum where applicant failed to question the accuracy of translation at his hearing and asserted no specific errors in translation on appeal).  Nor does Chan specify any particular translated statement as problematic, or explain how she was prejudiced thereby.

Moreover, while we have acknowledged that a "witness's demeanor is often a critical factor in determining his veracity,"

Aguilar-Solis, 168 F.3d at 570-71, it does not appear that the IJ relied upon Chan's demeanor in determining that her testimony was not credible.  Instead, he based his credibility finding on Chan's account of the September 14 demonstration.  We conclude that Chan's due process rights were not violated on the basis of the translation.

For the reasons set forth above, we **<u>affirm</u>** the Board of Immigration Appeals' judgment as to Chan's petitions.[5]

---

[5]As noted <u>supra</u>, our holding as to the asylum claim obviates further consideration of the withholding of deportation claim.  <u>See</u> <u>Mediouni</u>, 314 F.3d at 27.