# United States Court of Appeals
## For the First Circuit

No. 07-2328

GRACE M. LUTAAYA,

Petitioner,

v.

MICHAEL B. MUKASEY, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Torruella and Boudin, Circuit Judges.

William P. Joyce and Joyce & Associates P.C. on brief for petitioner.

Hillel R. Smith, Attorney, Office of Immigration Litigation, Jeffrey S. Bucholtz, Acting Assistant Attorney General, Civil Division, and Terri J. Scadron, Assistant Director, U.S. Department of Justice, on brief for respondent.

July 28, 2008

**LYNCH**, **Chief Judge**.  On July 11, 2007, the Board of Immigration Appeals ("BIA") denied relief from removal to Grace Lutaaya, a Ugandan citizen.  It affirmed an Immigration Judge's ("IJ") decision that (1) Lutaaya's asylum application was untimely filed and the delay was not excused, see 8 U.S.C. § 1158(a)(2)(B), (a)(2)(D); and (2) she had not met her burden for withholding of removal and protection under the Convention Against Torture ("CAT") because she was not credible.

On her petition for review, we lack jurisdiction over the denial of asylum.  The CAT claim is not before us because she did not exhaust that claim before the BIA.  The decision on her application for withholding of removal is amply supported in the record and we deny the petition.

I.

Grace Lutaaya entered the United States on December 11, 1997 on a six-month non-immigrant visitor visa, overstayed, and was charged with removability on September 13, 2000.  Lutaaya filed an application for relief, which is the subject of this petition, on April 13, 2005, claiming a fear of future persecution in Uganda because of her membership in the Democratic Party ("DP") and because she had been attacked in 1996 by members of the Ugandan military.  Lutaaya was given two hearings; the second was so that she could have additional time to collect documents, which were wanting, in support of her claim.

A.        Lutaaya's May 2005 Hearing

We describe Lutaaya's testimony before an IJ on May 20, 2005.[1]  She was born in Uganda and ran a delivery business with her husband Vincent Sabeera until 1996.  In January 1996, they won a government bid to deliver food supplies to soldiers fighting a rebel group known as the "Lord's Resistance Army" ("LRA") in the northern part of the country.  Sabeera left home in January for a delivery trip and was ambushed and abducted by LRA soldiers.[2]  The soldiers confiscated Sabeera's trucks and used them in several raids, leading the Ugandan government to suspect Sabeera and Lutaaya of collaborating with the LRA.

On April 2, 1996, four members of the Ugandan military came to Lutaaya's house in Entebbe.  They questioned her about Sabeera's whereabouts.  Lutaaya, who was seven months pregnant, told them that she did not know what had happened to him.  The soldiers accused her and Sabeera of cooperating with the LRA.  They beat her, cut her with a sword, and raped her.  The soldiers set

---

[1]    Lutaaya had been included as a spouse on an application for asylum filed on May 22, 2000 by Vincent Sabeera, also a native and citizen of Uganda.  Noting that Sabeera's testimony regarding his relationship to Lutaaya was "both internally and externally inconsistent," the asylum officer suspected that Lutaaya and Sabeera were brother and sister, not husband and wife, found Sabeera not credible, and denied the application.  Sabeera was ordered removed in absentia after he failed to appear for a scheduled hearing.

[2]    According to the asylum officer's report, Sabeera claimed that he escaped after several months.  He made his way to the United States, arriving in 1999.

fire to her house, but Lutaaya escaped and was taken to a hospital the next day. She delivered prematurely on April 4.

After leaving the hospital, Lutaaya stayed with her mother in a town about twenty-five miles away but fled in September after government agents sought her there. She stayed with friends throughout the country and obtained a visa from the American Embassy, leaving for the United States in December 1997. Lutaaya left her baby in the care of her mother and left her five older children in the care of relatives.

Lutaaya testified that she and her husband had been active supporters of the Democratic Party ("DP") in Uganda, a group that opposed the government but was unrelated to the LRA. She joined the DP in 1991 and supported the party by organizing the women's wing in Entebbe and, with Sabeera, hanging posters for campaigns.

Lutaaya stated that she feared future persecution from the Ugandan government because of her support for the DP and because "the same government" whose soldiers had attacked her for allegedly collaborating with the LRA was still in power. She stated that government agents went to her mother's place of business in September 2004 to inquire about Lutaaya's whereabouts.

When asked about her failure to apply for asylum within one year of her arrival, Lutaaya testified that she had not known

how to file and had lacked the funds to hire an attorney. She said that she could afford to file only after her husband arrived.

During questioning, the IJ and counsel for the government raised several discrepancies between Lutaaya's testimony and her earlier statements to the asylum officer who had interviewed her and Sabeera in 2000 and gave her the opportunity to explain. For example, the asylum officer reported that Sabeera and Lutaaya had claimed that the infant delivered on April 4, 1996 was stillborn, not premature. Lutaaya had also reportedly told the asylum officer that five soldiers, not four, were involved in the attack and rape. Her explanation for the discrepancy was that she denied making either statement to the asylum officer.

The IJ found that Lutaaya had not provided documentation to corroborate her testimony but granted her a continuance to enable her to obtain her birth certificate, hospital records from 1996, and records of her and her husband's membership in the DP. Lutaaya had submitted photographs purportedly of her stab wound from the attack.

B.       The November 2005 Hearing and the IJ's Decision

At the next hearing, nearly six months later on November 14, 2005, Lutaaya submitted an undated identification card from the DP, a copy of her birth certificate, photographs of her children and several school records, and a letter dated August 1, 2005 from

Dr. Odama Stephen Baroa of Hope Medical Center concerning her treatment in 1996.

The letter, titled "Mrs. Grace Lutaaya Sabera [sic] Mpoza's Medical Report," stated that Lutaaya had been brought into the hospital in 1996 with profuse bleeding; that she reported that she had been raped, stabbed, and beaten; and that she had delivered a premature baby.[3]  The IJ questioned Lutaaya about the letter and about her failure to obtain records contemporaneous with the 1996 hospitalization.  Lutaaya claimed that the letter was the only record she was able to obtain.  Under cross-examination, Lutaaya acknowledged that the letter contained both a telephone number and an email address, but testified that she had not followed up with the doctor to request medical records contemporaneous with her treatment.  The judge admitted the letter into evidence but stated that Lutaaya had not provided medical records as he had requested.

As to the undated party identification card, Lutaaya testified that she had received the card, through a friend, in

---

[3]     The letter stated:
The above-mentioned person has been my client from your 1994 -1996.  But in 03/04/1996.  She was brought at the unit at night with profuse bleeding from the back.  She reported that she was stabbed by a knife, raped and beaten, she was 32 weeks old pregnant unfortunately the following day she delivered a premature baby because of the torture done by the gang stars.  Fortunately the baby survived up to now the child is living.

September 2005 and had lost the original card when her home was burned.

The IJ issued an oral decision finding Lutaaya statutorily ineligible for asylum because she did not file her application within one year of her arrival and because she was not eligible for an exception to the filing deadline due to changed circumstances affecting her eligibility or extraordinary circumstances relating to the delay. See 8 U.S.C. § 1158(a)(2)(B), (a)(2)(D).

The IJ denied Lutaaya's application for withholding of removal as well, finding her not credible. The IJ relied on the record, the testimony, and the documentation. Though he had given Lutaaya the chance to provide additional documents, the IJ concluded that Lutaaya failed to corroborate her testimony, listing several concerns.

First, he found that Lutaaya did not provide credible testimony to show that she would be subject to persecution because of her support for the DP. While Lutaaya claimed that she and Sabeera were "strong members" of the party, Sabeera's asylum application "did not reflect any membership in the Democratic Party" or claim it as a basis for relief. The IJ found the membership card suspect and not credible, noting that it was undated.

Second, the IJ found Lutaaya's testimony about her marriage to Sabeera to be not credible. Sabeera's asylum application stated that he had only two children. Lutaaya's listed six, and the birth certificates of two of her children listed the father as a man with the last name of Mpoza.[4] Lutaaya had used the name "Mpoza" on several official documents, but rarely used "Sabeera". Both Lutaaya's 1996 visa and the passport with which she entered the United States, obtained in 1993, were under the name "Grace Najjemba Mpoza Lutaaya." In addition, while Lutaaya had submitted what purported to be a marriage certificate for her and Sabeera from October 12, 1984, she never submitted a divorce decree.

Finally, the IJ relied on the report of the asylum officer who had interviewed Lutaaya and Sabeera in 2000. The officer raised the possibility that Lutaaya and Sabeera were brother and sister rather than husband and wife and found Sabeera's testimony about their relationship not credible for a number of reasons. The officer questioned why Sabeera would have to ask permission from Lutaaya to live with her if they were husband and wife and found it unlikely that Sabeera would not have located his wife after he escaped detention and before she left Uganda. In addition, while Sabeera stated that he was not aware that his wife

_____

[4]    The other two birth certificates listed the father as a third man named "Mpoza Nsambya" with Lutaaya bearing the surname Nsambya as well.

was in the United States when he entered the country, he listed Waltham, Massachusetts -- the city in which Lutaaya lived -- as his intended address on his entrance documents. The officer also noted that Sabeera's mother and Lutaaya shared the same first name, that Lutaaya and Sabeera could not present a marriage certificate and Lutaaya could not produce a passport, that Sabeera had stated he had a sister in the United States but did not know where she was, and that Lutaaya was older than Sabeera.

Third, the IJ concluded that Lutaaya's testimony that she was attacked, stabbed, and raped was not credible. The IJ noted the inconsistencies between her testimony and the record and ruled that, although he had given her time to provide corroboration, Lutaaya had "not submitted any credible documentation to support her contention that she was attacked by Ugandan government officials or soldiers." He concluded that the photographs Lutaaya submitted of her purported stab wounds were not consistent with her testimony.

Fourth, the IJ found that Lutaaya's description of her hospitalization was not credible. Lutaaya failed to provide contemporaneous records, instead providing an after-the-fact letter from her purported doctor that was found to be not valid and not credible.[5]

---

[5] In addition, Lutaaya told the asylum officer that her baby had been stillborn; while in her testimony, she stated that the baby was premature.

Fifth, the IJ found Lutaaya's testimony as to why she left Uganda not to be credible.

Consequently, the IJ found that Lutaaya had not met her burden of establishing that it was more likely than not that she had been persecuted or would face persecution if she were to return to Uganda on the basis of one of five protected categories, see 8 U.S.C. § 1231(b)(3)(A), such as her membership in the DP.[6]

The BIA affirmed and wrote its own opinion. The BIA upheld the IJ's finding that Lutaaya's asylum application was untimely and that she failed to demonstrate extraordinary or changed circumstances. Noting the IJ's concerns regarding Lutaaya and Sabeera's true relationship and regarding the circumstances of the attack and rape, the BIA held that Lutaaya had not met her burden of showing them clearly erroneous, finding the concerns well supported in the record. The BIA concluded that Lutaaya had not met her burden of showing that it was "more likely than not" that she would be persecuted or tortured if she were made to return to Uganda. Lutaaya's timely petition followed.

---

[6] The IJ concluded that Lutaaya's CAT claim failed for similar reasons. Because Lutaaya had failed to substantiate her claim that she was beaten and raped, the IJ found that she had not established that she had been tortured in the past by the Ugandan government or that she would be tortured if she were to return to the country. Because Lutaaya did not challenge the IJ's denial of CAT relief before the BIA, that issue is not properly before this court. See Chikkeur v. Mukasey, 514 F.3d 1381, 1382 (1st Cir. 2008); see also 8 U.S.C. § 1252(d)(1).

-10-

II.

We consider petitioner's challenge to the BIA's decision on her asylum application separately from her withholding of removal claim.

A.        Lutaaya's Asylum Application

We have no jurisdiction to review the Attorney General's determination that an asylum application is untimely and unexcused by circumstances.  See 8 U.S.C. § 1158(a)(3); Heng v. Gonzales, 493 F.3d 46, 47 (1st Cir. 2007); Pan v. Gonzales, 489 F.3d 80, 84-85 (1st Cir. 2007).  Congress "carefully circumscribed the scope of judicial review" over timeliness determinations in such cases. Pan, 489 F.3d at 84.

Nonetheless, Lutaaya argues that we can review the denial of asylum under 8 U.S.C. § 1252(a)(2)(D) because, she argues, she presents "constitutional claims or questions of law" in a petition before the appropriate court of appeals, which are reviewable.  She argues that the IJ violated her due process rights by "fail[ing] to consider [Lutaaya]'s testimony and [failing to] allow [Lutaaya] to fully explain her reasons for failing to meet the one-year deadline."  This is not even a colorable constitutional claim and so we lack jurisdiction.  See Mehilli v. Gonzales, 433 F.3d 86, 93 (1st Cir. 2005); see also Pan, 489 F.3d at 84.  Indeed, Lutaaya

-11-

presents no constitutional claim at all.[7]  See Kalitani v. Ashcroft, 340 F.3d 1, 5 (1st Cir. 2003) ("[Petitioner]'s [due process] argument boils down to an assertion that the IJ should have believed her. But the IJ was not compelled to believe her, and substantial evidence . . . supports his decision not to do so."); Albathani v. INS, 318 F.3d 365, 372 (1st Cir. 2003) (concluding that an argument that the IJ "improperly overlooked evidence," thus violating petitioner's due process rights "is, in our view, just a variation on a substantial evidence challenge"); see also Mehilli, 433 F.3d at 93 ("BIA findings as to timeliness and changed circumstances are usually factual determinations.").

B.      Lutaaya's Withholding of Removal Claim

Where the BIA has written separately while deferring to and affirming the decision of an IJ, we review both the BIA's decision and the relevant portions of the IJ's decision. Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 20 (1st Cir. 2004).  We uphold the decision so long as it is "supported by reasonable, substantial, and probative evidence on the record considered as a

---

[7]     Lutaaya also argues that her counsel at the hearing asked questions that were "vague and poorly worded" such that Lutaaya was "unable to deliver fully-developed testimony as to why she did not file within one year."  However, neither Lutaaya's written response to the question in her asylum application of why the application was untimely nor her submission to this court provide any additional explanations.  If Lutaaya is attempting to raise an ineffective assistance of counsel claim, we need not consider it because Lutaaya failed to present it to the BIA.  See 8 U.S.C. § 1252(d)(1); Sombah v. Mukasey, 529 F.3d 49, 52 (1st Cir. 2008); Chikkeur, 514 F.3d at 1382.

-12-

whole." Tum v. Gonzales, 503 F.3d 159, 161 (1st Cir. 2007) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)) (internal quotation marks omitted). When the BIA has affirmed an IJ's adverse credibility determination, "we will uphold the determination unless the evidence compels a different result." Vallejo Piedrahita v. Mukasey, 524 F.3d 142, 144 (1st Cir. 2008).

To succeed on a claim for withholding of removal, the burden is on Lutaaya to show that, upon deportation, she is "more likely than not to face persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Sharari v. Gonzales, 407 F.3d 467, 474 (1st Cir. 2005); see also 8 U.S.C. § 1231(b)(3)(A). The conclusion that she did not meet her burden is supported by substantial evidence.

The IJ, as noted above, pointed to several material discrepancies, which are present in the record. See Cuko v. Mukasey, 522 F.3d 32, 36 (1st Cir. 2008). The BIA, in its separate opinion, noted discrepancies between the facts recounted in the asylum officer's report (such as the fact that Lutaaya's child was stillborn) and Lutaaya's later testimony and the facts stated in the doctor's letter.

These discrepancies are material and go to the heart of Lutaaya's claim.[8] Her membership and active support of the DP was

_____

[8] See Bojorques-Villanueva v. INS, 194 F.3d 14, 16 (1st Cir. 1999). The REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231, allows discrepancies to support an adverse credibility finding

the basis of her claim that she would face persecution if she were made to return to Uganda. The documents that she provided to substantiate her membership in the DP were unpersuasive.

Further, Lutaaya's and Sabeera's true relationship was material to her claim of past persecution. This relationship had already been rendered suspect by the asylum officer's report. In addition, while Sabeera's 2000 application for asylum, made part of the record, lists the date of their marriage as January 10, 1984, the purported marriage certificate that Lutaaya submitted to the IJ lists the date as October 12, 1984. In addition, Lutaaya claimed that she and Sabeera had divorced in the United States; she easily could have obtained the divorce decree.

Finally, there were discrepancies between Lutaaya's accounts that she was attacked and raped. See Zeru v. Gonzales, 503 F.3d 59, 69-71 (1st Cir. 2007) (concluding that an IJ could base a credibility determination on an applicant's inconsistent descriptions of a sexual attack where the applicant had the opportunity to explain discrepancies and to provide corroborating evidence). When pressed about the inconsistencies between her description of the purported rape and attack during her testimony and the asylum officer's report, she denied that was what she said

---

"without regard to whether [the] inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). This provision applies only to applications filed after May 11, 2005, and is inapplicable here. See Chanthou Hem v. Mukasey, 514 F.3d 67, 69 n.3 (1st Cir. 2008).

-14-

to the asylum officer and suggested that a "printing error" had occurred. As the agency found, Lutaaya was unable to provide a persuasive explanation for these discrepancies. A report from an asylum interview "enjoys a presumption of regularity." Pan, 489 F.3d at 86.

Lutaaya's brief argues that the IJ failed to address the credibility of her oral testimony but made an adverse credibility determination based purely on documents. This is flatly untrue: the IJ expressly relied on her testimony, along with the documentary evidence, to reach his adverse credibility determination. While an asylum applicant may carry his or her burden through credible testimony alone, see Diab v. Ashcroft, 397 F.3d 35, 40 (1st Cir. 2005), we cannot say that the evidence compels us to conclude that the IJ's determination that the testimony was not credible, and that a combination of testimony and corroborative evidence was required, see id., was in error.

Lutaaya argues that the IJ erred in finding Dr. Baroa's letter not credible. However, she failed to produce records contemporaneous with her hospitalization although she had been given a continuance to do so. And a letter written nine years after the fact purporting to be from a doctor was itself inconsistent with her testimony. The letter stated that Lutaaya was "brought [to] the unit at night." Under questioning from the IJ, however Lutaaya testified that neighbors administered first aid

-15-

and only took her to the hospital the morning after the attack. She had adequate time to produce contemporaneous records, but did not. See Rodriquez Del Carmen v. Gonzales, 441 F.3d 41, 44 (1st Cir. 2006) (concluding that the IJ was not compelled to credit documentary evidence given a reasonable basis to suspect its authenticity). The letter contained both a telephone number and an e-mail address for the hospital. Lutaaya had enough time to contact the hospital to request either contemporaneous records or some credible evidence that such records were unavailable.

The petition for review is denied.