# United States Court of Appeals
## For the First Circuit

No. 08-2243

EVGENIYA KARTASHEVA,
Petitioner,

v.

ERIC H. HOLDER,[*] JR.,
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, Selya, and Stahl, Circuit Judges.

Gary J. Yerman for petitioner.
Tracie N. Jones, with Michael F. Hertz, Acting Assistant
Attorney General, and Michelle Gorden Latour, Assistant Director,
for respondent.

September 11, 2009

---

[*]Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Eric
H. Holder, Jr. has been substituted for former Attorney General
Michael B. Mukasey as the respondent.

**STAHL, Circuit Judge.** Petitioner Evgeniya Kartasheva, a native of the Soviet Union and citizen of Uzbekistan, seeks review of a Board of Immigration Appeals ("Board") order denying her asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The Board adopted and affirmed the decision of an Immigration Judge ("IJ") who found that Kartasheva was not credible and that she had failed to establish eligibility for relief. Kartasheva's principal argument is that the Board, in adopting the IJ's conclusions, reached inappropriate conclusions about the credibility of her testimony. After careful consideration of the decision and the record below, we vacate and remand for additional proceedings.

## I.

The petitioner entered the United States on January 11, 2004, as a nonimmigrant B-2 visitor for pleasure with authorization to remain in the country for a temporary period not to exceed July 10, 2004. On August 5, 2004, well within the one-year filing deadline, she applied for asylum, withholding of removal, and CAT protection with the Department of Homeland Security ("DHS"). DHS then filed a Notice to Appear, claiming that Kartasheva was subject to removal as an nonimmigrant who had remained in the United States for a period longer than permitted. See 8 U.S.C. §§ 1101(a)(15), 1227(a)(1)(B). We recount the evidence as Kartasheva presented it

-2-

in her documentation and during her removal proceedings.  We next discuss the IJ's and Board's evaluation of that evidence.

## A.        Summary of Evidence

Kartasheva testified that her family moved to Uzbekistan from Russia in 1963 when she was nine years old.  She suffered a childhood of taunting and teasing.  Problems for the petitioner intensified in 1991, when Uzbekistan declared its independence.  In 1998, the petitioner was attacked near her home by several Uzbek men who pushed and inappropriately touched her and made lewd sexual comments, calling her, for example, a "Russian whore" and stating, "I'm going to show you some Uzbek love, you Russian bitch."[1]

---

[1]The testimony regarding this incident caused some confusion. Kartesheva wrote in her asylum application that following the incident, she contacted a police inspector who came to her home but made no arrests: "When the inspector came, he asked me about the attack, and then he searched my home, and told me that the police was [sic] keeping an eye on all Russian 'occupiers' and that the fact that some Uzbek men scared me didn't bother him at all."

At her asylum interview, the petitioner indicated that she called the police and told them to go the area of the attack but that an officer came to her apartment to complete a report.  Then, during cross-examination at the merits hearing, Kartasheva explained that she identified the perpetrators through a window in her apartment.  The government attorney seized upon this testimony, pointing out that the petitioner had not mentioned the identification in her asylum application or during her interview.

In his adverse credibility determination, the IJ observed that Kartasheva's account of the 1998 incident had changed.  However, at several places in his opinion, the IJ clearly confused the petitioner's testimony regarding two separate events -- the 1998 incident and a later incident in 2003 -- to support his finding that the petitioner's changing story regarding the 1998 incident supported his adverse credibility determination.

At the time of the attack, Kartasheva worked for a government adult education center, teaching a home economics course. After 21 years of employment, during which she was denied promotions and given limited hours, Kartasheva was terminated in 2000 because, she speculated, her position was filled by an Uzbek woman. Thereafter, she supported herself and her two daughters as a dressmaker working from home for private clients.

In June 2003, two days after Kartaheva's return from a trip to the United States, a police inspector visited her home and questioned her about her reasons for the trip. When the petitioner explained that she had traveled for vacation, the inspector became irritated, slapped her in the face, and stated that she really traveled abroad "to be infected by democracy." He warned her that the Uzbek police would be watching her and all other Russians residing in Uzbekistan. Kartasheva went to the local protection committee to register a complaint but was met with indifference.

Depressed after this encounter, Kartasheva visited a friend in Russia. Although she intended to stay for a month, the Russian police would grant only a residency permit good for not more than ten days because she was traveling from the "Republic of the Monkeys." When the petitioner protested that she was ethnically Russian, the official replied, "You're all the same -- apes." Kartasheva later paid a police officer roughly ninety dollars in order to remain an additional three days.

On August 18, 2003, as she left her church, the petitioner witnessed three Uzbek men harassing a Russian woman. Kartasheva attempted to intervene and was assaulted, pushed to the ground, and kicked. Police officers arrived, and when pressed, Kartasheva gave them her contact information. But when the officers summoned her to the station a few days later, they told her that she was becoming a nuisance and fined her roughly sixty dollars for disturbing the peace. After the attack, the petitioner sought medical care at a local clinic for injuries to her face and knee. She testified that she received various forms of physical therapy for these injuries.

The following month, on September 1, 2003, a friend and activist in the Human Rights Society of Uzbekistan ("HRSU") invited Kartasheva to attend a demonstration. Karasheva agreed and decided to join the participants upon observing the peaceful protest calling for free elections and personal freedoms. When police arrived, she was beaten and taken to the police station, where she was locked in a cell for approximately eight hours and then fined one hundred and twenty dollars.[2] After her release, the petitioner went to a clinic for treatment of her back and arm.

On October 14, 2003, and again on November 15, 2003, the petitioner was attacked physically by some of her Uzbek neighbors

---

[2]Kartasheva mentioned neither the sixty dollars fine after the August 18, 2003, arrest nor this one hundred and twenty dollars fine during her interview with the asylum officer.

in the courtyard and foyer of her building. After the first incident, Kartasheva visited the clinic for treatment and medication to reduce facial swelling and bruises. She testified that she also contacted the HRSU and decided to assist the organization by passing out leaflets on several occasions. That same month, she received a phone call from an individual named Malzakhanov who identified himself as a lieutenant of the security forces; he spoke disapprovingly of her involvement with the HRSU.[3]

On December 14, 2003, four agents of the National Security Service ("SNB"), including Lieutenant Malzakhanov, arrived at the petitioner's home. After searching her apartment and finding several HRSU brochures and leaflets, they arrested Kartasheva. The commotion woke her daughters who pleaded with the agents not to arrest their mother. One of the SNB agents slapped Kartasheva's eldest daughter and pushed both of the daughters into another room.[4] The petitioner then was handcuffed and taken to SNB headquarters where she was detained for three days. During her detention, she was interrogated and beaten until she agreed to sign

---

[3]Although Kartasheva noted this phone call in her written asylum application, she omitted mention of it during her interview with the asylum officer. On cross-examination, she explained, "I want to emphasize [the asylum officer] did not allow me to speak like I was afforded the opportunity here. She just asked me the question, and I gave her responses. That's all."

[4]Kartasheva, in her initial asylum application, asserted that the officers "beat" her daughter. In her amended statement, Kartasheva explained that the officers "slapped" her daughter, attributing the prior misstatement to a translation error.

a confession.[5]  Kartasheva was warned that if she were caught again, she would be killed.  After her release, she received treatment for injuries to her skull, ear, neck, and arms at a clinic.  The petitioner then decided to leave Uzbekistan for the United States.

**B.      Procedural History**

On July 19, 2004, an asylum officer interviewed Kartasheva about the claims in her asylum application.  Kartasheva appeared without counsel.  The asylum officer denied Kartasheva relief, finding her incredible and determining that statements made during her interview were inconsistent with statements on her written application.  Specifically, the officer noted that the petitioner did not mention the November 2003 phone call, the two fines from the Uzbek police, and particular aspects of her December 2003 arrest.  See supra notes 2-3, 5.  The officer concluded that the omissions were "material inconsistencies on the issue of persecution" and referred the case to an immigration judge for further consideration.

---

[5]In his written assessment, the asylum officer noted that Kartasheva, during her interview, discussed neither the beating of her daughter nor specific aspects of her treatment in detention, namely, that she was placed in a dark cell and not fed while in custody.  Apparently, Kartasheva did mention the length of her detention and the beatings she endured. On cross-examination, the petitioner attempted to explain the omission: "Most likely she didn't ask me. . . . [T]here's no way I wouldn't have told her this. . . . I only answered the questions that I was asked.  I was not telling my story."

After a master calendar hearing in May 2005, Kartasheva appeared for merits hearings on August 4, 2005, and September 18, 2006, before the IJ and testified to the above-recounted events. When asked how many times she had traveled to the United States, the petitioner first replied that she had visited five times, although in her asylum application, she listed only three visits prior to her last entry on January 11, 2004. Upon further questioning, Kartesheva acknowledged that she had traveled to the United States six times. She submitted that she could afford her trips, generally lasting several months, because "I had savings. . . . And I also have a brother in Russia that [sic] . . . was able to send me money."

Kartasheva additionally testified that her two daughters currently reside in Tashkent, Uzbekistan. Her younger daughter attends college and receives a merit-based government scholarship to cover her tuition. Her brother is a citizen and resident of Russia. Kartesheva claimed that, as an Uzbek citizen, she is ineligible for citizenship in Russia but admitted that she had never attempted to apply for Russian citizenship.

To support her claims, Kartasheva provided relevant excerpts from her medical history as prepared by the Tashkent Caterpillar Factory Polyclinic, obtained by Kartasheva's eldest daughter after her mother left the country; signed statements from her daughters and several friends; and country conditions evidence.

-8-

The medical report, signed by both the clinic's head physician and a surgeon, provided synopses of treatments for trauma including bruising, hemorrhages, and contusions on dates corresponding with those of the attacks. Meanwhile, two friends provided statements confirming that Kartasheva sympathized with the HRSU and was arrested during the September 1, 2003, demonstration, and a third indicated that the petitioner was imprisoned and fined after the September 2003 demonstration, and in October 2003, began attending HRSU meetings and disseminating materials. Finally, the record contains two letters from Kartasheva's daughters -- one merely indicating that they love and miss their mother and the other recounting the December 15, 2003, search of their apartment.[6]

On November 22, 2006, the IJ found Kartasheva removable as charged and denied her application for asylum, withholding of removal, and protection under the CAT. Specifically, the IJ held that Kartasheva failed to meet her burden of proof because her testimony was not credible: "[Kartasheva] was not credible because her account of some of the primary events that form[ed] her claim

---

[6]The IJ did not discuss this latter letter nor the third friend's signed statement in his decision, and neither party mentioned the documents in its brief. It is unclear from the record the exact nature of these documents although they are prepared in an identical fashion to the other signed statements that the IJ considered. Nonetheless, we are not only empowered but rather obligated to review the entire administrative record to assess whether the IJ's findings were supported by substantial evidence. See Lin v. Mukasey, 521 F.3d 22, 25-26 (1st Cir. 2008); Mukamusoni v. Ashcroft, 390 F.3d 110, 122 (1st Cir. 2004).

of persecution varied significantly between her in-Court testimony, her asylum interview testimony, and her initial application for asylum." Noting that the REAL ID Act was not applicable,[7] the IJ found that the inconsistencies were material and went to the heart of the petitioner's claim.

The IJ listed as problematic Kartasheva's account of the 1998 incident;[8] her changing description of the SNB agent's altercation with her daughter; the failure to tell the asylum officer about the 2003 phone call from the SNB lieutenant and the two fines from the Uzbek police; and her confusion regarding the number of visits to the United States. The IJ further found that the documentary evidence could not compensate for these issues. He noted that the medical evidence did not explain who might have beaten Kartasheva and asserted that the friends' statements, though they confirmed that Kartasheva sympathized with the HRSU and was arrested at the demonstration, "do not establish that the

---

[7]Nonmaterial inconsistencies or discrepancies in an alien's story were not sufficient to support an adverse credibility determination until Congress amended the Immigration and National Act's asylum provisions with the REAL ID Act. See 8 U.S.C. § 1158(b)(1)(B)(iii). Because Kartasheva's asylum application was filed before May 11, 2005, the effective date of the Act, the previous standard applies. See, e.g., Ly v. Mukasey, 524 F.3d 126, 131 n.1 (1st Cir. 2008). Thus, the IJ's adverse credibility finding "cannot rest on trivia but must be based on discrepancies that involved the heart of the asylum claim." Hem v. Mukasey, 514 F.3d 67, 69 (1st Cir. 2008) (internal quotations omitted).

[8]As noted above, see supra note 1, the IJ in several places confused Kartasheva's testimony about the 1998 attack with the August 2003 incident at her church.

respondent was an [HRSU] member or that she was arrested . . . as a result of her [HRSU] affiliation." He acknowledged neither the letter from the third friend which stated that Kartasheva was involved with HRSU activities nor the daughters' statement confirming the December 2003 search and arrest. Of the background information on Uzbekistan, the IJ stated that much dealt with the lack of religious freedom, a claim Kartasheva had failed to establish.

The Board adopted and affirmed the IJ's decision. Although it agreed with the petitioner that "not all of the Immigration Judge's concerns would by themselves support an adverse credibility assessment," it observed that the IJ's "observations were logically tied to material points of the [petitioner's] testimony," noting Kartasheva's omission of the 2003 phone call from Lieutenant Malzakhanov and her changing description of the beating (to slapping) of her daughter. The Board thus found "no clear error in [the IJ's] negative credibility determination when the factors are weighed cumulatively."

## II.

In order to qualify for asylum, Kartasheva must demonstrate that she is a "refugee," 8 U.S.C. § 1101(a)(42), defined as a person unwilling or unable to return to her native country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership

-11-

in a particular social group, or political opinion," id. §
1101(a)(42)(A).[9]   In order to support an asylum claim, "the
applicant must provide credible, persuasive, and sufficiently
detailed testimony."  Kasneci v. Gonzales, 415 F.3d 202, 204 (1st
Cir. 2005).

We review the agency's factual findings, including
credibility determinations, under the deferential substantial
evidence standard, Gao v. Gonzales, 467 F.3d 33, 37 (1st Cir.
2006), asking whether the adverse credibility determination is
"supported by reasonable, substantial, and probative evidence on
the record considered as a whole," Simo v. Gonzales, 445 F.3d 7, 11
(1st Cir. 2006) (citation omitted), and affirming "unless any
responsible adjudicator would be compelled to conclude to the
contrary," 8 U.S.C. § 1252(b)(4)(B).  See Sok v. Mukasey, 526 F.3d
48, 52-53 (1st Cir. 2008).  Where, as here, "the BIA has written
separately while deferring to and affirming the decision of an IJ,
we review both the BIA's decision and the relevant portions of the

---

[9]While an applicant for asylum must show that a reasonable
person in his circumstances would fear persecution, withholding of
removal requires proof of a clear probability of persecution.
Palma-Mazariegos v. Gonzáles, 428 F.3d 30, 37 (1st Cir. 2005).  To
warrant CAT protection, an alien must prove that "it is more likely
than not that he or she would be tortured if removed to the
proposed country of removal," 8 C.F.R. § 1208.16(c)(2), and that
this torture will occur "at the hands of the government or with the
consent or acquiescence of the government," De Oliveria v. Mukasey,
520 F.3d 78, 79 (1st Cir. 2008).

-12-

IJ's decision." Lutaaya v. Mukasey, 535 F.3d 63, 70 (1st Cir. 2008).

We give great respect to the IJ so long as he provides "'specific and cogent reasons' why an inconsistency, or a series of inconsistencies, render the alien's testimony not credible." Wiratama v. Mukasey, 538 F.3d 1, 4 (1st Cir. 2008) (quoting Hoxha v. Gonzales, 446 F.3d 210, 214 (1st Cir. 2006)). These inconsistencies must go to the heart of the claim and pertain to material facts, "not merely to peripheral or trivial matters." Zheng v. Gonzeles, 464 F.3d 60, 63 (1st Cir. 2006).[10]

Thus, our deference is not unlimited, and this is particularly so where we are concerned with legal analysis regarding the petitioner's testimony rather than demeanor evidence. See Ly, 524 F.3d at 131; Heng v. Gonzales, 493 F.3d 46, 48 (1st Cir. 2007). Ultimately, "we may not affirm the BIA's decision 'when [we] cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" Gailius v. INS, 147 F.3d 34, 44 (1st Cir. 1998) (quoting Univ. Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

While an IJ may assume an asylum officer's report is accurate and thus support an adverse credibility finding with

---

[10]See supra note 7.

statements made at an asylum interview, see, e.g., Pan v. Gonzales, 489 F.3d 80, 86 (1st Cir. 2007), the IJ must make an individualized assessment of the petitioner's credibility, Long v. Gonzales, 422 F.3d 37, 40-41 (1st Cir. 2005). This requirement recognizes the procedural differences between an asylum interview and the hearing before the IJ. See Singh v. Gonzales, 403 F.3d 1081, 1089-90 (9th Cir. 2005) ("The Assessment To Refer does not contain any record of the questions and answers at the asylum interview, or other detailed, contemporary, chronological notes of the interview, but only a short, conclusory summary-essentially, an opinion. There is no transcript of the interview. There is no indication of the language of the interview or of the administration of an oath before it took place. The asylum officer did not testify at the removal hearing."). We do not mean to suggest that hearing testimony invariably trumps asylum interview statements; we suggest only that the procedural differences should be weighed in the balance. How that balance is struck will vary case by case, depending on the facts and circumstances.

In the present case, we are compelled to hold that the IJ's adverse credibility determination must be set aside. The IJ and Board listed several ultimately inadequate reasons, though not demeanor, for finding Kartasheva incredible. We turn now to the IJ's and Board's grounds and find each flawed to varying degrees.

-14-

The IJ's first ground for finding Kartasheva incredible centered on her testimony regarding the 1998 attack near her home. Specifically, the IJ noted that Kartasheva did not explain until her immigration hearing that she had identified her attackers to a reporting officer through a window. We find the IJ's reasoning here defective for several reasons, not the least of which is his own misdescription of the event in which he transposed details of the 2003 church attack into his narration of Karatasheva's testimony about the 1998 attack. Cf. Zheng, 464 F.3d at 64 ("Even if an IJ's credibility determination is based in part on an incorrect analysis of hearing testimony, however, we may nonetheless affirm where we conclude that no realistic possibility exists that, absent the error, the IJ would have reached a different conclusion."). While Kartasheva added a detail about this event during her testimony, it was not implausible given her previous descriptions of the incident. Cf. Jin Lin v. Holder, 561 F.3d 68, 72-73 (1st Cir. 2009) (affirming negative credibility finding where petitioner changed both location of arrest and circumstances of release).

Moreover, we agree with Kartasheva that the omission of her identification of the attackers in the application and at the asylum interview was central neither to the event in question, namely, a physical attack followed by official indifference to which she attested in her application and at both her interview and

-15-

the hearing, nor to her claim as a whole. The 1998 incident occurred nearly eight years before the immigration hearing, which occurred more than two years after the filing of the application and interview. Cf. Bojorques-Villaneuva v. INS, 194 F.3d 14, 17-18 (1st Cir. 1999) (noting that testimony occurred within six months of application). And it predated the more serious incidents of 2003 by at least four years. See also Heng, 493 F.3d at 49 ("Asylum applicants are not required to list every incident of persecution.") (quotation omitted).

By this same reasoning, we deal summarily with Kartasheva's omissions during her asylum interview of two fines following arrests, the phone call from Lieutenant Malzakhanov, and elements of her December 2003 arrest. Standing alone, the omission of such details during the asylum interview did not render the petitioner incredible. The two fines and the 2003 phone call were peripheral to her claim, and she was consistent about their existence in both her application and during her testimony. Moreover, she did not change her story during the asylum interview but simply omitted small details. Cf. Munoz-Monsalve v. Mukasey, 551 F.3d 1, 8 (1st Cir. 2008) ("Simply put, this is a case in which the petitioner has told different tales at different times."); Long, 422 F.3d at 39 (asylum officer noted that the petitioner could not recall significant details about his political group and his imprisonment and changed his explanation of whether authorities

threatened his business).  Further, Kartasheva's explanation for the minor omissions, particularly given the translation issues evident during the hearing, was appreciable -- while she answered all questions truthfully, she constrained the interview to those questions posed to her.  Cf.  Lutaaya, 535 F.3d at 71 (observing that petitioner denied making statements during interview and then suggested that a printing error had occurred).

The IJ also expressed concern that the petitioner first described her daughter as being beaten and later amended her statement to explain that the SNB officer slapped her daughter. But Kartasheva voluntarily amended her description of the altercation, see Ly, 524 F.3d at 131; the detail was not a central fact of her arrest and subsequent imprisonment and beating, see Heng, 493 F.3d at 48 (noting essence of claim was arrest and detention without water); and particularly given Kartesheva's language difficulties, we are not convinced that this change in language actually can be characterized as a discrepancy, see id. at 49 (noting that petitioner first crediting political members and then human rights workers for her release was not necessarily inconsistent).

The IJ finally noted Kartasheva's "implausible level of confusion regarding her number of visits to the United States." We agree that Kartasheva's initial failure to account accurately for her visits is somewhat troubling, particularly as it marks her

-17-

one instance of inconsistency, rather than omission. But we do not find her level of confusion, evident on the face of the record, implausible. Rather, this portion of the hearing was marked by numerous translation difficulties. See Heng, 493 F.3d at 49. And Kartasheva was not evasive; instead, once she understood the questions posed, she candidly admitted each trip. See Castañeda-Castillo v. Gonzales, 488 F.3d 17, 24 (1st Cir. 2007) (en banc) (disagreeing with IJ's characterization of petitioner as evasive). Given our discussion of the other grounds on which the Board rested its adverse credibility determination, we cannot conscientiously find Kartasheva's confusion in this instance sufficiently substantial to support the Board's ultimate conclusion.

Additionally, we find the IJ's attention to Kartasheva's documentary evidence concerning. First, the IJ dismissed the petitioner's medical history report, which confirmed that she was beaten on several occasions, because it did not explain who had beaten her. Such a requirement to us is preposterous -- we are unaware of such a procedural requirement even here in the United States, and nothing in the record suggests such detailed reporting is required in Uzbekistan. Cf. Sok, 526 F.3d at 55 ("[T]he record . . . contains no evidence that the procedures the IJ assumed to exist in Cambodia are commonplace."). Moreover, the medical report corroborates the petitioner's claim. It lists dates of medical treatments that correspond with dates on which Kartasheva was

attacked by either civilians or the police. For example, on December 18, 2003, four days after the SNB officers' search of Kartasheva's apartment and following her subsequent arrest, days-long imprisonment, and beatings, the clinic treated her for a closed-skull brain injury, a hemorrhage on the top of her head, a contusion of the left ear lobe, a contusion and hemorrhage on the rib cage, and bruises on the lower left jaw and neck. This entry thus stands to contradict the IJ's claim that though Kartasheva included information about prison abuse, she had "provided no evidence beyond her own testimony that any such abuse befell her."

We disagree also with the IJ's assessment of the letters from the petitioner's friends and daughters. The IJ found that the friends' letters did not establish a link between Kartasheva's arrests and HRSU involvement. The first friend confirmed that Kartasheva sympathized with the HRSU and the second that Kartasheva was "arrested by Police from a Demonstration organized by the HRSU organization." Our view of these statements, particularly the latter, is that they in fact do provide some authentication for issues relevant to Kartasheva's claim that her arrests were due to political activity. Moreover, a third letter from A. Korchagin, also translated, certified, and accompanied by photocopied Uzbekistan photograph identification card, attests that Korchagin invited the petitioner to participate in the September 1, 2003, HRSU demonstration for which they were arrested, held in detention,

and fined, and that in October 2003, Kartasheva attended an HRSU meeting and began disseminating materials. Although the IJ did not mention this letter in his opinion, it is part of the record and provides solid evidence of a causal relationship between Kartasheva's political activities and her arrests.[11]

While the IJ correctly observed that a letter marked Exhibit 12 from Kartasheva's daughters "provides no corroboration of her account of her experiences in Uzbekistan," a second translated and certified letter appears in the record which recounts the December 15, 2003, apartment search and arrest of Kartasheva. The IJ did not note this letter, but as it is in the administrative record before us, we include it in our consideration as part of "the body of evidence opposed to the Board's view.'" Gailius, 147 F.3d at 44 (quoting Univ. Camera Corp., 340 U.S. at 488).

Finally, we disapprove of the attention that the IJ gave to the background information about Uzbekistan provided by Kartasheva. The IJ summarily claimed that "[m]uch of the respondent's information on country conditions in Uzbekistan concerns the lack of religious freedom in this country . . ." But by our count, only seventeen of the sixty-two documents in Exhibit 4 relate to religious persecution. The rest involve human rights

---

[11] See supra note 6.

reports, information on mistreatment and torture in prisons, and accounts of crackdowns on political meetings.

## III.

In sum, the IJ's credibility determination is both confused and confusingly explained. We find lacking an itemization of the substantial evidence necessary for an adverse credibility determination, and thus, the determination cannot be allowed to stand. Because the Board limited its reasoning to the adverse credibility finding and did not discuss Kartasheva's eligibility for relief, "we must remand to the agency to make a well-reasoned and well-explained determination of [Kartasheva's] eligibility." Sok, 526 F.3d at 58. "[T]his task may well require the presentation of additional evidence and further arguments by the parties." Id.

For the foregoing reasons, the petitioner's petition for review is **granted**, and the case is **remanded** for further proceedings consistent with this opinion. The Board's order of removal is **vacated**.