THOMPSON, Circuit Judge,
dissenting.
The difficulty of balancing deference against deficiency in the immigration context provokes divided panels from time to time. See, e.g., Mejilla-Romero v. Holder, 600 F.3d 63, 76 (1st Cir.2010) (Stahl, J., dissenting), vacated on reh’g, 614 F.3d 572 (1st Cir.2010); Rasiah v. Holder, 589 F.3d 1, 6 (1st Cir.2009) (Lipez, J., dissenting); Cuko v. Mukasey, 522 F.3d 32, 41 (1st Cir.2008) (Cyr, J., dissenting). Unfortunately, today I find myself alone on such a panel.[12] I cannot conscientiously join my colleagues in upholding the IJ’s and BIA’s error-riddled decisions denying asylum re *11 lief to Petitioner Alphonse Dehonzai. This is a case where, it seems to me, the degree of deference the majority exercises “turns our review function into a hollow exercise in rubber-stamping.” Cuko, 522 F.3d at 41 (Cyr, J., dissenting). Accordingly, I dissent.
Background
The record viewed as a whole — including documentary evidence of conditions in Cote D’Ivoire — reveals the following:
On July 25, 2000, Dehonzai obtained entry to the United States by presenting a friend’s passport on arrival at J.F.K. Airport in New York, New York. About a year later he filed for asylum and other relief.
When Dehonzai left Cote D’Ivoire, the country had suffered from years of turmoil. According to the earliest information provided by Dehonzai — a 1992 Amnesty International report — following political demonstrations in February 1992, more than 250 people were wrongfully arrested and detained. The protesters, many of whom were members of the Fédération Estudiantine et Seolaire de Cote d’Ivoire (FESCI), objected to the Ivorian government’s decision not to punish General Robert Gue'i for ordering an army raid on Abidjan University that resulted in students being beaten and raped. Some of those arrested were released, others were held without charges, and still others, including persons who did not actually participate in the demonstrations, were charged with crimes of association.
Years later, in December 1999, the Ivorian army seized power of Cote D’Ivoire and installed General Gue'i as Head of State. In the wake of the coup, political freedom declined: members of the deposed government were arrested by soldiers, members of opposition parties were required to have government clearance to move about or to leave the country, and political demonstrations were banned. Search warrants, often lacking a name or address, were issued and executed freely; government watchdogs suspected that private correspondence was routinely and widely monitored. Soldiers attacked friends and relatives of politicians, beating them with guns, forcing them to do pushups and crawl on the ground, binding and kicking them, and threatening them with death. Soldiers sometimes arrested and abused civilians on the basis of simple denunciations, without any efforts to investigate or corroborate the claims. According to the U.S. Department of State, it became common for civilians to be detained — often at Akouedo military camp— for days without being charged. Perhaps most disturbingly, the military regime maintained a practice of summarily executing civilians, including students and civil servants, often on the basis of simple denunciations and without any investigation or concrete evidence of wrongdoing. Some of the most common targets of the post-coup Ivorian regime included supporters of Alassane Ouattara,[13] leader of the political party Rassemblement des Républicains (RDR), students and FESCI members, and journalists.
Dehonzai included material detailing all these facts with his application. In addition, Dehonzai represented in his appliea *12 tion that he had served as an advisor to Onattara and FESCI, that he had been arrested and detained for three days after participating in one of the 1992 protests, and that he had been arrested and detained after criticizing the government’s abuse of his journalist cousin in 2000. Regarding the latter incident, the application included the following representation (sic): “I was severaly beaten as they did for my cousin Jules Toualy. They beat me with a bundle of electric wire with tennis ball at the end, the ball continually struck my back.” The application also referred specifically to an attached exhibit, an Amnesty International report which included an account of the government’s detention and abuse of Jules Toualy. This document contained a first-person account of Mr. Toualy’s experience, including the following phrase: “They beat me again with a bundle of electric wire with a tennis ball at the end. The ball continually struck my back.” Finally, the application represented that Dehonzai had been detained “for about 5 days ... tortured and severly [sic] beaten.” Dehonzai signed the 1-589 and dated the form May 30, 2001; Al Mondel, who was listed as the form’s preparer, signed the form and dated it June 15, 2001.
The INS denied the application and instead initiated removal proceedings. On December 16, 2003, Dehonzai appeared in immigration court and conceded his removability but sought leave to pursue asylum and other relief. A series of hearings ensued, during which Dehonzai testified that he had a fear of persecution stemming largely from the 1992 and 2000 incidents.
Regarding the 1992 incident, Dehonzai testified to the following facts. In February 1992, Dehonzai was arrested for his participation in one of the student marches stemming from the raid on Abidjan University. He was held for three days, over the course of which he was interrogated, kicked, beaten with wires, forced to stoop, and forced to do pushups. At the end of the three-day period, he was released.
Regarding the 2000 incident, Dehonzai testified to the following facts. Dehonzai’s cousin, the journalist Jules Toualy, was arrested and beaten by agents of the Ivorian government. On April 12, 2000, Dehonzai spoke out at work against the detention and torture of his cousin. Among the approximately twelve people who heard Dehonzai’s speech was a government informant who reported Dehonzai to the government. On the night of May 29, 2000, government agents forcibly entered Dehonzai’s home and removed him to Akouedo military camp. He was held for two days, over the course of which he was beaten with wood, beaten with wires, kicked, and threatened with death. At the end of the two-day period, he was released.
At a subsequent hearing, the IJ issued an oral decision denying relief on the ground that Dehonzai’s testimony lacked credibility. The IJ based his decision on several factors, including chronological implausibilities, language mirroring the Amnesty International report, and Dehonzai’s evasive manner of answering questions. Dehonzai appealed the IJ’s decision to the BIA, which dismissed his appeal and ordered him removed. This petition for review followed. The majority denies the petition; I would grant it and remand.
Our Review of Credibility
The majority’s decision hinges on upholding the IJ and BIA’s adverse credibility determination. It is true that we review credibility determinations under the deferential substantial evidence standard. See Kartasheva v. Holder, 582 F.3d 96, 105 (1st Cir.2009). The majority spells out our general policy of deference but implies that deference is the alpha and omega of our review. This is not so.
*13 Instead, we have recognized that “the fact that an IJ considers a petitioner not to be credible constitutes the beginning not the end of our inquiry.” Wiratama v. Mukasey, 538 F.3d 1, 4 (1st Cir.2008) (quoting Aguilerar-Cota v. I.N.S., 914 F.2d 1375, 1381 (9th Cir.1990)). “[0]ur deference is not unlimited,” Kartasheva, 582 F.3d at 105, and thus we must determine whether the IJ’s determination has “sturdy roots in the administrative record,” looking to the IJ’s decision for “specific and cogent reasons why an inconsistency, or a series of inconsistencies, render the alien’s testimony not credible.” Wiratama, 538 F.3d at 4 (internal quotation marks removed). “[W]e may not affirm the agency’s decision when we cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the agency’s view.” Sok v. Mukasey, 526 F.3d 48, 53 (1st Cir. 2008) (quoting Mukamusoni v. Ashcroft, 390 F.3d 110, 119 (1st Cir.2004) (internal quotation marks and brackets removed)). Finally, because Dehonzai’s petition predates the REAL ID Act, the IJ’s adverse credibility determination must be founded on inconsistencies that “go to the heart of the claim and pertain to material facts, not merely to peripheral or trivial matters.” Kartasheva, 582 F.3d at 105 (internal quotation marks removed). These principles are well-recognized.
Indeed, applying our standard of review to past cases, we have held that remand on the issue of credibility is required where “the IJ and [BIA] misstate [an immigrant’s] testimony, apply labels (like inconsistent and evasive) that are at odds with what the transcript shows, and draw inferences that appear wholly speculative and without record support.” Castanedas-Castillo v. Gonzales, 488 F.3d 17, 24 (1st Cir. 2007) (en banc). We have also held that remand is required where the IJ’s decision rests on specifically enumerated but “ultimately inadequate reasons,” and where “numerous translation difficulties” undercut an IJ’s finding of inconsistent testimony or evasive demeanor. Kartasheva, 582 F.3d at 105-06, 107. To anchor these holdings firmly to their statutory basis at 8 U.S.C. § 1252(b)(4)(B), where determinations of the immigration courts reflect these sorts of deficiencies, “any reasonable adjudicator would be compelled to conclude to the contrary.” Immigration courts may not simply say “not credible” and free their faulty decisions from the fetters of robust judicial review.
I am convinced that those authorities applied to these facts compel remand. My reasoning follows.
Virtually Identical Language
The majority begins with Dehonzai and Toualy’s “virtually identical” language regarding their respective beatings with a bundle of wire with a tennis ball on the end. The IJ found the linguistic similarity troubling and concluded that Dehonzai had “adopted the Toualy story for his own purposes.” The BIA and the majority agree. But I find myself compelled to conclude otherwise: the IJ failed to consider carefully the nature of the similarity, failed to apply adequate procedural safeguards, ignored corroborating evidence, and therefore erred.
In seeking affirmance of the BIA and IJ’s adverse credibility determination on the basis of similar language, the government relies in large part on Mei Chai Ye v. U.S. Dept, of Justice, 489 F.3d 517 (2d Cir.2007), where a panel of the Second Circuit upheld an adverse credibility determination based on the immigrant’s use of similar language to another immigrant from another set of proceedings. Id. at *14 520. I agree that the case is helpful, and I would follow it. The case deserves a thorough discussion.
In Ye, the petitioner Mei Chai Ye sought asylum, withholding of removal, and CAT protection on the basis of two forced abortions she claimed to have suffered in her native China. 489 F.3d at 520. In support of her application for relief, she filed a statement detailing her alleged treatment in China. Id. At a hearing on June 13, 2003, the IJ noted that Ye’s statement bore certain striking similarities to a statement filed by another applicant in an entirely unrelated case. Id. The IJ requested that DHS produce redacted versions of the two statements so he could compare the two without impacting either’s privacy; DHS agreed. Id. at 521.
At the next hearing, DHS produced the documents (demonstrating that the IJ’s recollection had been spot-on), and the IJ gave Ye’s attorney a chance to respond to the similarities. 489 F.3d at 521. The attorney suggested that the similarities could be due to “a pattern of practice of the Chinese government” or a consistent style of translation if the statements had been translated by the same person. Id. The hearing adjourned without any resolution. Id. Another hearing followed, at which the IJ noted that he had provided the attorneys with carefully annotated versions of the statements, pointing out each of the many similarities. Id. at 522. He again sought an adequate explanation for these near-identical documents, but again no resolution occurred. Id. Still another hearing followed, at which point Ye’s attorney withdrew due to a conflict, and the IJ finally issued an oral decision. Id. The IJ denied Ye any relief, finding that her credibility had been demolished by twenty-three discrete portions of the statement whose language, grammar, and order were all but identical to corresponding portions of the statement that had been filed by an unrelated applicant in an unrelated case. Id. at 522-23. The IJ specifically based this finding of unreliability on (1) Ye’s failure to provide any convincing explanation for the similarities despite opportunities at multiple hearings, (2) the absence of any evidence attributing the similarity to a translator, and (3) the absence of evidence that the other petitioner might have plagiarized Ye. Id. at 523. Ye appealed this decision to the BIA, which summarily affirmed; a petition to the Second Circuit followed. Id.
A panel of the Second Circuit denied Ye’s petition for review, citing the IJ’s careful consideration of possible reasons for the damaging similarities and his meticulous adherence to a number of procedural precautions. 489 F.3d at 524-25. Specifically, the court issued its holding in the form of a multi-pronged rule that an adverse credibility determination may be appropriate where an IJ: “(1) carefully identifies any similarities; (2) closely considers the nature and number of those particular similarities ... and (3) rigorously complies with ... [certain] procedural protections----” Id. at 526. Expounding on the third prong, the court listed some specific procedural protections, recommending that an IJ allow an applicant (a) to respond to the allegedly offending similarities, (b) to investigate potential plagiarism, and (c) to consider the possibility of inaccurate or formulaic translation. Id. However, the court suggested that these enumerated protections were a floor, not a ceiling, noting that the IJ had gone much further by:
(1) notifying Ye of the similarities, and providing her with copies of his annotations; (2) openly and exhaustively expressing to Ye his concerns about the inter-proceeding similarities; (3) granting Ye several opportunities to comment *15 on those similarities; and (4) inviting Ye to offer evidence of plagiarism, inaccurate translations, or any other possible innocent explanation.
Id. at 525. The court strongly suggested that adherence to the IJ’s cautious and deliberate procedure was the better course of action. Id. at 527.
Throughout the opinion, the court followed a general policy of reviewing an IJ’s reliance on inter-proceeding similarities “with an especially cautious eye.” 489 F.3d at 520. Indeed, the court suggested that an IJ’s full compliance with the rule above should result not in affirmance but only in deference; on the other hand, any “less rigorous approach” by an IJ should be met with outright skepticism. Id. at 527. I offer an analysis under the Ye framework; given the peculiarity of finding a statement less reliable because of close corroboration, it seems only appropriate that we ought to review the procedure and analysis the IJ followed here with the especially cautious eye prescribed by the Second Circuit.
First, the IJ here did not carefully identify the offending linguistic similarity before issuing his decision. Instead, he noted broadly that “there is a eery [sic] similarity between what happened to Mr. Toualy and what happened to the respondent.” In context, this statement doesn’t even seem addressed to linguistic similarity, but rather to the timing of Dehonzai’s and Toualy’s arrests. The IJ’s lack of clarity here contrasts sharply with the IJ’s meticulous annotations in Ye. See 489 F.3d at 525. My skepticism is therefore piqued. See id. at 527.
Second, the IJ did not closely consider the nature or the number of the single similarity at issue here. Had he done so, he would have noticed that Dehonzai introduced his statement with the phrase “as they did for my cousin Jules Toualy” and went on to refer explicitly to the Amnesty International report. Dehonzai’s choice to call the government’s attention to this similar language is more consistent with proper citation and comparison than with plagiarism. Also, had the IJ closely considered the similarity at issue, he would have recognized that the two documents could easily reflect the respective stories of cousins who were held at the same military camp by the same repressive regime six weeks apart, and subjected to a single instance each of the same mistreatment among other disparate abuses. The intertwined nature of the accounts at issue here stands in sharp contrast to the facts in Ye, which involved unaffiliated immigrants in unrelated proceedings whose statements matched point by point on at least twenty-three different details. See 489 F.3d at 522-23. These circumstances are different enough that they alone practically compel a different result. Indeed, the nature and number of the similarity here — a single, appropriately cited instance of similar treatment occurring at the same place within a narrow time frame — cannot reasonably support a finding of fabrication or plagiarism.
Third, the IJ did not rigorously adhere to any of the procedural protections spelled out in Ye. Contrary to the majority’s conclusion, he did not afford Dehonzai any opportunity to explain the similar language, except to the extent that he allowed the following exchange to take place during cross examination:
DHS: You copied that, didn’t you, sir, out of an article you read about Jules Toualy, didn’t you, sir? The Amnesty International article where Jules Toualy gave a statement and said, the last line he said, that was not enough for them. They beat me again with a bundle of electric wire with a tennis ball at the end. The ball continually struck my *16 back. The exact same words that you use in your application, right, sir? Dehonzai: I apologize. In Africa when they’ve sent you to the police station, and when they beat you, they do, that’s what the police does. You have to, they kick you. You have to be strong. And you have to crawl in water.
DHS: Well, sir, there’s nothing. Dehonzai: They don’t really feed you, most people. I’m sorry. I’ve just described what they do continually all the time.
Allowing the government to ask a heated, accusatory, compound question is hardly equivalent to the sort of careful, objective, and repeated prompts that characterized the IJ’s approach in Ye. Cf. 489 F.3d at 520-22. And here the IJ’s observation of the “eery similarity” between Dehonzai’s and Toualy’s situations, which the majority cites as providing a “reasonable opportunity” for Dehonzai to explain the similar language, says nothing of the similar language but instead has to do with the timing of Dehonzai’s and Toualy’s arrests. In fact, I can discern no procedural protections whatsoever in the IJ’s approach here. Thus, all three Ye factors counsel strongly against the IJ’s decision.
Other factors counsel rejection of linguistic similarity as a basis for finding Dehonzai not credible. The Ye court noted at one point the danger that “similarities may have been inserted into the documents by the translators rather than by the applicants themselves.” 489 F.3d at 524. Given that Dehonzai testified that he did not speak English at the time his application was prepared, the IJ ought to have considered whether the similar language might be attributable to the translator rather than Dehonzai himself. More importantly, though, there is ample material in the record to suggest that the language that troubled the IJ is an accurate description of Dehonzai’s experience. In fact, all of the evidence suggests that both Dehonzai and Toualy were arrested, detained, and abused by the same regime at the same military camp. The Toualy letter corroborates the familial relationship between him and Dehonzai.[14] The Amnesty International and State Department country reports corroborate the regular arrest and detention at Akouedo of journalists (including Toualy specifically) and civilians denounced for expressing their political beliefs. The country reports also demonstrate that civilians in detention were commonly beaten with objects ranging from iron bars to whips.[15] This corroborating evidence, which the IJ ignored, compels remand in my view.
Plausible Implausibilities
Next the majority defers to the IJ’s finding of chronological “implausibilities” that supported his adverse credibility finding. When reviewing credibility determinations based on discrepancies or implausibilities, we normally conduct a three- *17 pronged analysis: first, we determine whether “the discrepancies articulated by the IJ and/or the BIA are actually present in the administrative record”; second, we look to whether “the discrepancies generate specific and cogent reasons from which to infer that petitioner or his witnesses provided non-ereditworthy testimony”; and third, we examine whether the “petitioner failed to provide a persuasive explanation for these discrepancies.” Cuko, 522 F.3d at 37.
The IJ’s finding glaringly fails the second prong. The IJ found it “implausib[le] ... that the respondent would be arrested and beaten eight years after his protest march in February of 1992.” The purported chronological implausibility also included the six-week gap between Dehonzai’s statements at work and his second detention. The IJ’s reasoning for finding these implausible was that “the chronology just does not work.” This analysis does not set forth any specific and cogent reason as to why the chronology should be viewed as implausible in order to support an adverse credibility determination. See Cuko, 522 F.3d at 37; see also Wiratama, 538 F.3d at 4. Indeed, not once in these proceedings has anyone posited an actual rationale for why this “chronology just does not work.” Any reasonable adjudicator would be compelled to find the IJ’s conclusion a baseless tautology; deferring to this shell of a legal analysis renders our review meaningless.
What Evasive Demeanor?
Next the majority defers to the IJ’s “observ[ation] that the respondent’s demeanor and manner of response to the straightforward questions was frequently evasive and respondent seemed to intentionally misunderstand the questions that were direct.” Despite the IJ’s invocation of the word “demeanor,” it is clear from his analysis — relying on evasiveness and apparently intentional misunderstandings — that the IJ was actually referring to Dehonzai’s manner of responding to questions rather than his physical appearance on the stand. Indeed, there is no discussion in the decision of any physical manifestation of Dehonzai’s demeanor that would support an adverse credibility determination on that ground. I would therefore proceed under the rule that credibility determinations that “rest ‘on an analysis of the petitioner’s testimony and not her demeanor ... receive less than usual deference.’ ” Wiratama, 538 F.3d at 4 (quoting Heng v. Gonzales, 493 F.3d 46, 48 (1st Cir.2007)).
Dehonzai appears from the record to have candidly discussed every topic that arose in questioning.[16] A review of his candid responses would entail a regurgitation of the whole of his testimony, but it is worth noting that even the name on his friend’s passport, which he withheld for some time out of fear for his friend’s well-being, was eventually relinquished. In fact, the only specific evidence the IJ pointed to in support of his finding that Dehonzai was evasive is that Dehonzai “g[ave] no detail whatsoever, regarding the effect of his arrest and subsequent hiding with Jean Baptiste, in terms of the effect it must have had on his wife and children.” Here, the IJ seems to be calling for speculation rather than testimony. Dehonzai testified that he had no contact *18 with his wife, but that “if my life is in danger, she went to her parents.” He also testified that he did not know for certain where his wife or children were, and that logistically he could not have brought his family to safety here. It does not appear from the record that the IJ or counsel sought any further information or detail during this exchange. Thus, Dehonzai’s testimony regarding his family was hardly evasive, and the IJ’s reliance on this testimony simply makes no sense. Any reasonable adjudicator would be compelled to conclude that Dehonzai was not evasive.
Overlooked Evidence
The majority next mentions that Dehonzai had plenty of notice “of the need to buttress his case.” In fact, he did so. Given our mandate to review the record as a whole, we ought to take a look at the swaths of relevant material in the record that the IJ and BIA skipped over in rendering their decisions. Some of this material was specific to Dehonzai, including the Toualy letter and the potential arrest warrant.[17] This relevant evidence deserved thoughtful consideration; instead, it received out-of-hand rejections on irrelevant grounds.
More importantly, however, the IJ and BIA appear to have ignored the Amnesty International and State Department country reports (with the sole and notable exception of the much-discussed Jules Toualy quote) that make up much of the record. Although DHS regulations no longer expressly require a credibility determination to be conducted “in light of general conditions in the applicant’s country of nationality,” 8 C.F.R. § 208.18 (1997) (superseded by current version), we may still find error where the IJ and BIA “unreasonably ignored these reports, and gave no explanation for why [they] did so.” Mukamusoni, 390 F.3d at 124. Indeed, “[s]uch documentary evidence is extremely important for contextualizing, in the absence of direct corroboration, the events which [an applicant] claims constitute persecution.” Id. (internal quotation marks removed). This context can help a fact-finder in the “endeavor not to allow. preconceptions garnered from life in the United States to color [an] evaluation of events that took place in foreign lands.” Sok, 526 F.3d at 56. Such nuance was and is lacking in the IJ, BIA, and majority’s respective reviews.
To sum up my view, this is the sort of ease where “the IJ and [BIA] misstate[d] *19 [an immigrant’s] testimony, applied] labels (like inconsistent and evasive) that are at odds with what the transcript shows, and dr[e]w inferences that appear wholly speculative and without record support.” Castañeda-Castillo, 488 F.3d at 24. Indeed, I have examined “the IJ’s and [BIA]’s grounds and f[ou]nd each flawed to varying degrees.” Kartasheva, 582 F.3d at 106. Thus, I at least “cannot conscientiously find that the evidence supporting that decision is substantial,” and I think we ought to overturn the IJ’s and BIA’s decisions and remand for a determination of the merits of Dehonzai’s asylum application. See Sok, 526 F.3d at 53.
Put another way: “the whole sometimes can exceed the sum of the parts,” as the majority quotes Mariko v. Holder, 632 F.3d 1, 6 (1st Cir.2011); here, if each of the immigration courts’ errors were individually a rotting fish, the whole of their decisions’ stench would be truly unbearable.
Conclusion
If our review began and ended with deference, then there would be no point to the exercise. Instead, the law directs us to remand when the immigration courts pass down erroneous or deficient decisions. Today my colleagues avert their eyes from such errors and deficiencies in the name of deference, with the result that Dehonzai will be cast into the middle of the very turmoil that led him to seek refuge with our own Mother of Exiles in the first place. I cannot, and therefore dissent.

. There is one exception: I agree with footnote 7 of the majority opinion.

. To depart from the record briefly, Ouattara was elected President of Cote D’Ivoire in 2010. After months of bloody struggle against outgoing President Laurent Gbagbo, Ouattara appears to have gained control. The situation is now mixed: although the conflict seems to have ended, Ivorians continue to flee to refugee camps in neighboring Guinea and Liberia, and human rights inspectors continue to discover unmarked mass graves.

. This is difficult to square with the IJ's specific and incorrect finding that "[t]he respondent was unable to produce any documentation to corroborate his alleged relationship with Jules Toualy.” (Emphasis added.) It seems to me that a flatly wrong finding by the IJ would compel a reasonable adjudicator to reach a contrary conclusion. The majority wishes away the IJ's error by deeming the letter ''insufficient.” They do not explain why this is so.

. Although Toualy's is the only other account which involves a bundle of wires with a tennis ball at the end, a brief catalogue illustrates the depraved creativity of the Ivorian regime. In addition to iron bars, whips, and wire bundles, members of the military and police used the following implements to conduct beatings at various times: boards with nails, whips, truncheons, rifle butts, sticks, belts, and branches.

. Even the portions of Dehonzai's testimony that seem most to have troubled the IJ— where the IJ was asking about the circumstances under which Dehonzai was fired from his job — are remarkably consistent. Dehonzai first testified that the firing was politically motivated, then attempted to explain the political motivation, then, when prompted to limit his answer to one sentence, he did so: "Well, when I criticized the military who had beaten my cousin, and I did, I expressed this criticism in the workplace.”

. The government ridiculed and the IJ dismissed a French-language document which Dehonzai suggested was an arrest warrant, making reference to the translation of that document as a “certificate of investigation” indicating that Dehonzai “was investigated for political activity.” It is true that most repressive regimes likely would not issue certificates indicating that they had investigated individuals for political activity. However, my own reference to the online version of the Pocket Oxford-Hachette French Dictionary indicates that the French phrase "est recherché,” which was translated as "was investigated,” is also an idiom for "is wanted,” as in: "il est recherché par la police: he's wanted by the police.” See recherché, Dictionaire Frangais-Anglais WordReference.com. Thus, the phrase "est recherché” in the purported warrant appears better translated as "is wanted” rather than "was investigated,” and the possibility that the document actually is an arrest warrant is suddenly bolstered.
Corroborating evidence from the country reports documenting the proliferation of free-form warrants further counsels that we reject the IJ’s careless dismissal of this document. See Sok, 526 F.3d at 55 (remanding where the record contained some support for the petitioner but none for the IJ’s assumption). And as to the majority’s suggestion that argument regarding the warrant is waived, Dehonzai’s brief discusses the warrant at pages 5-6, argues that he produced ample evidence to support his fear of arrest at page 13, and discusses the corroborative value of the country report at pages 14-15.