# United States Court of Appeals
## For the First Circuit

No. 10-2165

MARIUS STANCIU,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,

Boudin and Thompson, Circuit Judges.

Eman H. Jajonie-Daman, Anthony J. McEachern and Amer S. Hakim & Associates, P.C. on brief for petitioner.
John D. Williams, Department of Justice, Civil Division, Office of Immigration Litigation, Tony West, Assistant Attorney General, Civil Division, and Jennifer P. Levings, Senior Litigation Counsel, Office of Immigration Litigation, on brief for respondent.

October 25, 2011

**BOUDIN**, **Circuit Judge**.  Marius Stanciu, a native and citizen of Romania, has petitioned for review of a decision of the Board of Immigration Appeals ("BIA").  See 8 U.S.C. § 1252(a)(1) (2006).  The BIA affirmed the denial by the immigration judge ("IJ") of Stanciu's applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").  Stanciu is ethnically Romani (colloquially a "Gypsy"), and his applications rested on claims of persecution by Romanian police and security forces on account of his Romani heritage.

Stanciu entered the United States on March 22, 2006, on a valid visa that permitted him to work as a truck driver for a specific company until December 10, 2006.  In November 2006, a commercial truck inspection revealed that Stanciu had switched employers without authorization and was working as a truck driver for a different company in violation of the terms of his visa.  See 8 U.S.C. § 1227(a)(1)(C)(i).

When federal authorities began removal proceedings, Stanciu conceded removability but sought the relief described above.  At a May 2008 hearing, Stanciu (who was represented by counsel) and his wife, Monica Stanciu, testified and submitted various materials.  He later filed a post-hearing affidavit requested by the IJ who asked that Stanciu address what the IJ considered to be discrepancies in his testimony.

Stanciu described two early incidents in which police falsely accused him of stealing money and beat him in seeking to extort confessions. He also testified that, as a truck driver transporting goods around Europe, he was regularly detained by government security officers on returning to Romania for anywhere between ten hours and two days and questioned and beaten. He reported that he was regularly harassed by local police and, after his first trip to the United States in late 2004, was detained and beaten by officers on his return to Romania.

Stanciu said that in December 2005, after returning from a second trip to the United States, he was again detained at the airport, held in custody for about a week and savagely beaten. He testified that the officers slapped him and beat him on his palms, arms, back, legs, and feet, forcing him to "sit up on the chair like in a regular sitting position but not on the chair. [He] just had to bend [his] knees and stand like that with [his] hands out and they beat [him] on [his] legs." When Stanciu refused to sign a blank page, the officers slammed a drawer shut on his fingers.

Stanciu said he ended up at the hospital, where he stayed for "four or five days" recovering from his injuries. He also submitted a one-page document that he said his wife acquired from the hospital, which described injuries consistent with the beatings he had recounted. Stanciu's wife confirmed that he had arrived home after his trip six days late and badly beaten, but she also

testified that the hospital refused to admit him, offered him medicine and sent him home where he recovered.

Stanciu testified that he continued to be harassed in the months after that incident and was unable to leave the country because the police had his passport; but, in March 2006, his former employer recovered it for him and he left for the United States shortly thereafter. He did not, however, apply for asylum on arriving in the United States, but sought asylum only after removal proceedings were begun against him.

Stanciu included a State Department Country Report on Romania, which said that "[s]ocietal violence and discrimination against the Roma was pervasive"; described "numerous credible reports of police mistreatment and abuse of detainees and Roma, primarily through excessive force and beatings by police"; and noted that "Roma were denied access to, or refused service in, many public places," and that "Roma faced persistent poverty with poor access to government services, few employment opportunities, high rates of school attrition, inadequate health care, and pervasive discrimination."

After reviewing Stanciu's post-hearing affidavit addressed to alleged discrepancies, the IJ denied Stanciu's applications for relief in a detailed fifteen-page order. The IJ did not dispute that Roma are subject to both official and private discrimination and mistreatment in Romania, but she regarded the

two central incidents needed to establish past persecution of Stanciu to be the detentions and beatings by Romanian officials when Stanciu returned from the United States in 2004 and 2005. These, the IJ acknowledged, were "plausible in light of verifiable conditions in Romania"; but, she concluded, Stanciu's

> incredible testimony concerning the frequency and severity of any such mistreatment and his evident attempts to embellish the harm most recently inflicted upon him and his deception concerning his subsequent voluntary travel in and out of Romania[] are fatal to his claim that this mistreatment [wa]s severe enough to have constituted persecution.

The IJ further pointed, as bases for doubts about Stanciu's credibility, to specific inconsistencies (discussed below), to Stanciu's ability to travel frequently in and out of Romania, to his failure to apply for asylum during previous trips to the United States, and to his extended family's apparent willingness to remain in Romania.

Disbelieving Stanciu as to the two key incidents, the IJ found that he had not established past persecution nor a well-founded fear of future persecution. This led to the denial of the asylum application, a failure to meet the higher standard of proof required for withholding of removal and the lack of any incidents that even arguably amounted to torture that would permit Stanciu to meet his burden of showing under CAT that future torture was likely. On further review, the BIA affirmed, finding the IJ's

adverse credibility determination to be adequately supported by specific evidence in the record.

In this court, Stanciu's arguments collapse into a central claim, namely, that the record establishes past persecution of Stanciu--indeed, torture--and that the alleged discrepancies were adequately explained or insufficiently serious to undercut his testimony. Stanciu's arguments are not frivolous but to prevail on factual and credibility issues, Stanciu must show that the agency's position is unsupported by substantial evidence and "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); Toribio-Chavez v. Holder, 611 F.3d 57, 62 (1st Cir. 2010).

The judge who heard the testimony first hand always has an advantage over reviewing courts, but, in addition, the IJ here provided specific examples of discrepancies and also gave Stanciu a further opportunity to assuage doubts. "We give great respect to the IJ so long as he provides specific and cogent reasons why an inconsistency, or a series of inconsistencies, render the alien's testimony not credible." Kartasheva v. Holder, 582 F.3d 96, 105 (1st Cir. 2009) (internal quotation marks omitted). And, Stanciu's claim is governed by a statutory amendment that gives weight to

such flaws even if they do not go "to the heart of the applicant's claim."[1]

Stanciu's descriptions are far from incredible on their face, so we turn to the specific discrepancies on which the IJ rested, considering as well the BIA's discussion since it supported the IJ's analysis. Toribio-Chavez v. Holder, 611 F.3d 57, 62 (1st Cir. 2010). The IJ's assessment rested not on a single conflict or concern but rather on the aggregate as casting doubt on what the IJ agreed were events that plausibly could have occurred.

First, Stanciu testified that in 2005 he was beaten by Romanian authorities so badly that he was hospitalized for "four to five days," yet his wife testified that he was turned away from the hospital (although given "calming medicines") and recovered from his injuries entirely at home. Stanciu's explanation for this discrepancy in his post-hearing affidavit was that he was disoriented after the beating and believed he had recovered in the hospital.

The explanation is not itself incredible but it does not account for the change in his story between the hearing, where he

---

[1]REAL ID Act of 2005, Pub. L. No. 109-13, div. B, § 101(a)(3), 119 Stat. 302, 303 (codified at 8 U.S.C. § 1158(b)(1)(B)(iii) (2006)). In setting out familiar criteria for credibility, Congress provided that they included "any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." Id.; see also Mariko v. Holder, 632 F.3d 1, 5-6 (1st Cir. 2011).

-7-

was sure he was in the hospital for several days, and the affidavit, where disorientation was alleged to have clouded his recollection. It is also somewhat troubling that Stanciu testified in the first instance directly contrary to his wife on a subject that can hardly have gone unmentioned between the couple in the days and months after the episode.

The next inconsistency concerned Stanciu's travels to Germany in February and March 2006. Stanciu's travels abroad were indirectly relevant to his persecution claim because they bore on his ability to leave and re-enter Romania at will and his willingness to expose himself to border crossings that posed a special opportunity for harassment. E.g., Loho v. Mukasey, 531 F.3d 1016, 1017-18 (9th Cir. 2008). The trips to Germany were relatively recent in relation to the hearing, which took place in May 2008, and not easily explained by a lapse in memory.

Yet Stanciu insisted during his hearing testimony--even after being confronted with indications in his passport to the contrary--that he had not left Romania at those times. His wife testified that he had made the visits, the passport stamps confirmed the travel, and he later admitted in his post-hearing affidavit that he had gone to Germany and sought citizenship there. We cannot fault the IJ for finding Stanciu's explanation in the affidavit--that he "simply forgot" about that travel due to stress and an unspecified medical condition--inadequate.

The third inconsistency identified by the IJ related to the length of Stanciu's detention when he returned to Romania from his second trip to the United States in December 2005. Stanciu had originally claimed in his asylum application that he was detained for ten days, amending this at the hearing to six days. He then testified that he arrived in Romania on December 6, and was detained for "six or seven days." This meshed with the testimony of his wife who said that he arrived home on December 12 and with the record that she said she had obtained from the hospital about his treatment.[2]

However, Stanciu's passport and the Department of Homeland Security's computerized travel records indicate that he actually left the United States on December 1, 2005, and arrived in Romania on December 2. This might make the original ten-day detention story more plausible, but it did not square with his own hearing testimony; and when pressed by the IJ, Stanciu responded in his post-hearing affidavit--irrelevantly--that his asylum application stated only that he returned in "December 2005," without specifying any particular date.

There are some other concerns as well. The government pressed Stanciu on his failure to request asylum during his several

_____

[2]At the hearing, the IJ questioned the accuracy of both the testimony of Stanciu's wife as to the severity of his condition and the authenticity of the one-page document, which bore no seals or letterhead, purporting to be from the hospital where Stanciu was treated.

earlier trips to the United States, waiting instead until removal proceedings had commenced before filing a defensive application. Stanciu said that he had been scammed by an American attorney in 2004 who told him that he could not obtain asylum but only a green card, and that he originally believed such an application had been made on his behalf even though no record of one has been found.

That such scams occur is certain, but it leaves open the question of why over a period of several years of allegedly increasing mistreatment in Romania and two more visits to the United States, Stanciu did nothing more to pursue an asylum claim.[3] The reason for his failure to do so in March 2006, after two further alleged episodes of brutal treatment, is not obvious--especially because he had a paying job and only a short-term visa and so faced obvious risks in doing nothing.

In our view, the tensions in Stanciu's testimony are neither overwhelming nor trivial; the extent to which his explanations resolve or exacerbate the problems are a judgment call that a reasonable fact-finder could resolve either way. And the two episodes in question are critical to his persecution and torture claims.[4] Social discrimination and mistreatment--here

---

[3]Stanciu did say that he spoke to different immigration lawyers during his trips to the United States in 2005 and 2006, but there is no indication that he ever inquired further of any of them about his eligibility for asylum.

[4]Stanciu says that his wife testified to his injuries, that the IJ deemed her credible and that this alone established

-10-

established independently by Stanciu's wife's testimony and the Country Report--are one thing; severe and brutal beatings by government agents, certainly where a recurring pattern, focused on one individual are another.

In sum, the IJ's unwillingness to accept the key testimony has some basis in the record.  That such mistreatment would be "plausible" does not mean that it in fact occurred or at least that it occurred with the duration and severity necessary to establish persecution or torture.  These two episodes aside, the treatment of Roma is deplorable but it is not, on this record, so uniform and universal in its severity as to give every Roma an assured right to asylum.  Cf. Rasiah v. Holder, 589 F.3d 1, 5 (1st Cir. 2009).

Since Stanciu's asylum claim fails, his application for withholding of removal necessarily fails as well.  E.g., Burbiene v. Holder, 568 F.3d 251, 256 (1st Cir. 2009); Santosa v. Mukasey, 528 F.3d 88, 92 & n.1 (1st Cir. 2008).  And, without the support of the two main episodes, no claim of likely future torture is possible.

The petition for review is denied.

---

persecution; but what the IJ found credible were her descriptions of societal discrimination.  The IJ did not endorse, and appears to have discounted, her testimony about the December 2005 injuries.

-11-