# United States Court of Appeals
## For the First Circuit

No. 10-1616

ABDALLAH JABRI,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

Robert B. Huntington, with whom Carlos E. Estrada was on brief, for petitioner.
Charles S. Greene, III, Attorney, Office of Immigration Litigation, Civil Division, with whom Tony West, Assistant Attorney General, Civil Division, and Mark C. Walters, Senior Litigation Counsel, Office of Immigration Litigation, were on brief, for respondent.

March 16, 2012

**HOWARD**, **Circuit Judge**.  Petitioner Abdallah Jabri, a native and citizen of Jordan, seeks review of a Board of Immigration Appeals ("BIA" or "Board") order denying him asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").[1]  The Board's order upheld the determination of an immigration judge ("IJ") that Jabri's claim was not credible and that he had therefore failed to establish eligibility for relief. Jabri's principal contention is that this determination was based on inappropriate conclusions regarding the credibility of his claim.  After careful consideration of the agency decisions and a close review of the record, we vacate and remand for additional proceedings.

I.

Jabri entered the United States together with his immediate family in 1997, when he was eight years old.  The family members subsequently overstayed their visas and settled in New Hampshire.  In April 2009, removal proceedings were initiated against Jabri, who conceded removability but cross-applied for asylum, withholding of removal, and protection under CAT.

---

[1] The petitioner also challenges the denial of his alternative request for voluntary departure.  Because this denial was based solely on a discretionary determination, we lack jurisdiction to review it.  See 8 U.S.C. §§ 1101(f), 1229c(f), 1252(a)(2)(B); Hussain v. Holder, 576 F.3d 54, 59 (1st Cir. 2009); Bernal-Vallejo v. INS, 195 F.3d 56, 62-63 (1st Cir. 1999).  We accordingly dismiss this portion of the petition.

-2-

Jabri's applications center around his claimed conversion from Islam to Christianity in late 2008. In an affidavit and at a hearing held before an IJ, Jabri explained that although he was born into a Muslim family, he grew up in a predominantly Christian community where he was routinely exposed to Christian teachings and customs. He stated that as he explored his religious identity, first as a boy of high school age and then as a young adult, he felt increasingly drawn to the tenets of Christianity. He testified to attending Bible studies and Christian church services and holiday celebrations intermittently beginning in 2004. Following a year of intensified exploration, and feeling that he "was falling off track" and "needed a permanent faith in his life,"[2] Jabri claims that he officially converted to Christianity on December 2, 2008, when he recited a sinner's prayer and took communion at a Pentecostal church.

Jabri asserts that he will be persecuted on account of his conversion if returned to Jordan. There was evidence that the Jordanian constitution stipulates that Muslims' personal status is governed by Islamic law, according to which apostasy may be punished by an inability to own property, find employment, marry,

---

[2] Around this time, local authorities were conducting a criminal investigation into attempted fraudulent use of his uncle's credit card, an offense to which Jabri pled guilty in April 2009. The timing of his alleged conversion, coinciding as it does with his coming to the attention of the authorities, is thus suspicious.

-3-

or maintain custody of one's children. Jabri fears that his paternal grandfather, who Jabri says is a strongly religious and prominent member of the Muslim community with strong ties to the Jordanian government, will wield his influence to ensure that the full panoply of such consequences come to bear. Moreover, he testified that he fears that his grandfather may provoke an honor killing to protect the well-known family name. These concerns, Jabri avers, are based on multiple threats that his grandfather made upon learning of his interest in and eventual conversion to Christianity.

In support of his claim, Jabri submitted testimony and an affidavit from his father as well as an affidavit from his mother. Both parents described their son's religious journey, the grandfather's threats in response, and the power that the grandfather has to ensure that his threats are carried out. Jabri also provided affidavits from family friends and church leaders attesting to his Christian faith, as well as country conditions evidence illustrating the dangers faced by Christian converts in Jordan.

The IJ denied Jabri's applications on the grounds that he and his father were not credible witnesses. The IJ found to be problematic differences between the testimony of Jabri and that of his father. The IJ focused on inconsistencies regarding a Bible that Jabri claimed to have kept, and regarding the details of how

the grandfather learned of and reacted to Jabri's alleged conversion. The IJ noted that such inconsistencies "may be considered minor when taken alone, but are significant when considered in the aggregate." The IJ did not dispute the potential consequences of apostasy but, on the basis of these perceived inconsistencies, disbelieved that Jabri had in fact converted to Christianity. The IJ further found that the supporting affidavits and documentary evidence were insufficient to overcome these discrepancies. The negative credibility finding, in turn, proved fatal to Jabri's ability to demonstrate that he fell within the statutory definition of "refugee" or, for purposes of his CAT claim, would be in danger of being subjected to torture upon return to Jordan. See 8 C.F.R. §§ 1208.13, 1208.16 (2011).

On review, the Board adopted and affirmed the IJ's decision, finding the adverse credibility determinations to be adequately supported by specific evidence in the record. This timely petition for judicial review followed.

II.

Jabri's arguments properly before us coalesce around a central theme, namely, that the record establishes that he has a well-founded fear of persecution on account of his conversion to Christianity and there were no inconsistencies that would suffice to undercut the credibility of his claim. His pitch is that, in finding his claim incredible, the IJ and BIA ignored substantial

portions of the evidence and placed inappropriate emphasis on inconsistencies that were not material and in some instances were nonexistent.

To the extent that the petitioner argues that the inconsistencies identified by the IJ and BIA concerned immaterial or "collateral" matters and could not therefore form the basis of the adverse credibility determinations, he misapprehends the applicable law. This argument, and the cases that the petitioner relies on to support it, are based on the "heart of the matter" rule, whereby an adverse credibility determination may not be predicated on inconsistencies in an applicant's testimony that do not go to the heart of his claim. See Bojorques-Villanueva v. INS, 194 F.3d 14, 16 (1st Cir. 1999). That rule was superseded by the Real ID Act with respect to applications that, like the petitioner's, were filed on or after May 11, 2005. See Pub. L. No. 109-13, div. B, tit. I, § 101(h)(2), 119 Stat. 231, 305 (2005) (codified at 8 U.S.C. § 1158 note (2005) (Effective Date of 2005 Amendment)); see also Lin v. Mukasey, 521 F.3d 22, 26-28 (1st Cir. 2008). Under the Real ID Act, a trier of fact may base an adverse credibility determination on any inconsistency in the record that has a bearing on the petitioner's veracity, "without regard to whether [the] inconsistency . . . goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii); 8 U.S.C. § 1231(b)(3)(C). Consequently, we may not reverse the adverse

credibility determinations on the ground that the inconsistencies relied upon in reaching and affirming those determinations were not central to Jabri's claim.

The petitioner's suggestion that the adverse credibility determinations were premised in part on nonexistent inconsistencies and an incomplete consideration of the evidence does, however, give us pause. Although we review the agency's factual findings, including credibility determinations, under the deferential substantial evidence standard, e.g., Rivas-Mira v. Holder, 556 F.3d 1, 4 (1st Cir. 2009), our deference is not unlimited. "We give great respect to the IJ [only] so long as he provides specific and cogent reasons why an inconsistency, or a series of inconsistencies, render the alien's testimony not credible." Stanciu v. Holder, 659 F.3d 203, 206 (1st Cir. 2011) (citing Kartasheva v. Holder, 582 F.3d 96, 105 (1st Cir.2009)). Moreover, while the Real ID Act permits the IJ to consider inconsistencies that do not go to the heart of the applicant's claim, he may only do so as part of his consideration of "the totality of the circumstances, and all relevant factors." 8 U.S.C. § 1158(b)(1)(B)(iii); cf. Lin, 521 F.3d at 25-26 ("In assessing whether findings are supported by the record, we review the entire record, not merely the evidence that supports the BIA's conclusions."). The IJ must, in other words, present a reasoned

analysis of the evidence as a whole. We are not satisfied that the IJ has done so here.

The IJ's adverse credibility determinations were predicated primarily on three perceived inconsistencies between the testimonies of the petitioner and his father, at least two of which are not direct inconsistencies. The first concerns the presence of a Bible in the Jabri household. The petitioner testified that during a 2005 visit to the United States his grandfather became aware of Jabri's then-nascent interest in Christianity upon observing a Bible belonging to the petitioner in the family home. The IJ found it significant that the petitioner's father testified that he had never seen a Bible in the home and did not mention the Bible as one of the issues that the grandfather raised during a later argument in which the grandfather derided the family's failure to adhere to the practices of Islam. It is not implausible, however, that the Bible went unnoticed by the father, and indeed the father testified that although he himself did not see the Bible, he had discussed his son's possession of it with his wife. Nor is it of particular import that the grandfather did not specifically mention the Bible during the argument in question. In concluding that had the grandfather seen the Bible, it "would have . . . been an issue that [he] would have raised that day in the litany of reasons why he was upset with the [petitioner] and his siblings," the IJ appears to have assumed that the Bible would have

been equally if not more troubling to the grandfather than the issues that he did raise, such as the siblings' frequent interaction with Christians and their failure to attend mosque, to pray, and, in the case of the petitioner's sisters, to wear veils. But whether or not the grandfather mentioned the Bible in the argument strikes us as having little to do with whether there was a Bible in the household at some point.

The second alleged inconsistency concerns the extent of the retaliatory action that the grandfather allegedly threatened upon learning of the petitioner's conversion. The IJ remarked that while "the [petitioner] has specially testified that his father told him that he would be the subject of an honor killing and that his family would also be tortured[,] [t]he [petitioner]'s father has made no mention of this." The IJ's decision notes that the father testified only that the petitioner, and the petitioner alone, could be "hurt." But the record taken as a whole tells a different story: the father expressly mentioned the threat of death elsewhere in his testimony and in his affidavit. Moreover, that the father did not discuss the possibility of harm to the remainder of the family is unremarkable given the context of the relevant colloquy, which focused on the harm the father feared would be inflicted upon the petitioner.

We are left, then, with the third inconsistency relied upon by the IJ in reaching his adverse credibility determinations.

When questioned about the manner and moment in which the grandfather was apprised of the petitioner's alleged conversion, the petitioner and his father offered divergent accounts. The petitioner testified that he disclosed his conversion to his grandfather during a three-way telephone call with his grandfather and father in March 2009. He further indicated that the conversation was prompted by the grandfather, who, the petitioner believed, had been warned of the conversion by the petitioner's uncle. The father, meanwhile, testified that he alone told the grandfather of the conversion in January or February 2009 when, after much thought and consultation with his wife, he made a one-on-one call to the grandfather with the explicit purpose of telling him about the conversion. The father also stated that he did not inform the petitioner's uncle of the conversion until long after he had spoken with the grandfather.

Upon careful inspection of the record evidence, we are left to wonder whether some of this seeming dissimilitude is not attributable to a failure, on the part of the IJ and the witnesses alike, to distinguish carefully between exchanges involving the grandfather during the period of the petitioner's increasing gravitation towards Christianity, on the one hand, and following his actual conversion, on the other. Even crediting the agency's supportable determination that the inconsistencies on this topic

are irreconcilable, however, the overall negative credibility finding is suspect.

The IJ's disbelief of the petitioner's claimed conversion to Christianity rested not on any single inconsistency between the testimonies of the petitioner and his father, but on all of them in the aggregate. Moreover, it was on the basis of the aggregate of perceived inconsistences that the IJ summarily dismissed the whole of the petitioner's supporting evidence. That evidence included his mother's testimony by affidavit, which affirmed that he converted. It also included an affidavit from a local business owner and friend indicating that he took Jabri to church with him in 2004 and that the two of them frequently discussed Christianity throughout Jabri's subsequent path to conversion. Letters from a pastor and church administrator about Jabri's church attendance lent additional credence to his claim.

Furthermore, there was consistency in the testimony that the grandfather had threatened to use his power and influence with Jordanian officials to punish the petitioner for his apostasy. In addition, under the laws of Jordan, it appears that such consequences for apostasy were legal and approved, regardless of the grandfather's influence.

Having concluded that the record does not adequately support the IJ's reliance on two of the three primary perceived inconsistencies that entered into the credibility calculus, we will

-11-

remand to the agency to determine whether any remaining inconsistencies are sufficient to discredit the petitioner's claim in its entirety, particularly in view of the evidence in his favor. See Gailius v. INS, 147 F.3d 34, 47 (1st Cir. 1998); Cordero-Trejo v. INS, 40 F.3d 482, 492 (1st Cir. 1994). Because any remaining inconsistencies must be considered in light of "the totality of the circumstances, and all relevant factors," including not only the body of potentially corroborating evidence but also the demeanor of the witnesses, 8 U.S.C. § 1158(b)(1)(B)(iii), a new evidentiary hearing may be necessary. In this regard, although assignments are within the agency's discretion, given the prior credibility determination, confidence would be enhanced if the matter were assigned to a different IJ.

The order of the BIA is **vacated** and the matter is **remanded** to the BIA for further proceedings consistent with this opinion.