# United States Court of Appeals
## For the First Circuit

No. 14-1810

JHONATAN ACOSTA,

Petitioner,

v.

LORETTA E. LYNCH,[*]
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Thompson, and Barron,
Circuit Judges.

Carlos E. Estrada, on brief for petitioner.
Lindsay M. Murphy, Trial Attorney, Office of Immigration
Litigation, Civil Division, U.S. Department of Justice,
Benjamin C. Mizer, Principal Deputy Assistant Attorney General,
Civil Division, and Keith I. McManus, Senior Litigation Counsel,
on brief for respondent.

April 22, 2016

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Loretta E.
Lynch is substituted for former Attorney General Eric H. Holder,
Jr. as respondent.

**TORRUELLA**, **Circuit Judge**.  Petitioner Jhonatan Acosta ("Acosta") petitions this court to review a decision of the Board of Immigration Appeals ("BIA") affirming an Immigration Judge's ("IJ") decision that Acosta is removable as "[a]n alien present in the United States without being admitted or paroled" under Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i).  He contends that the BIA and IJ erred in their determinations that his testimony before the IJ was not credible.  In addition, he asserts that the BIA erred by summarily affirming the IJ's decision to give no weight to his favorable polygraph test.  For the reasons that follow, we deny the petition.

## I.  Factual and Procedural Background

A native and citizen of Colombia, Acosta is twenty-seven years old and currently resides in Boston, Massachusetts.  He is married to a United States citizen and is a stepfather to her two children.  In June 2010, Acosta sought to register permanent residence or adjust status before the United States Citizenship and Immigration Services ("USCIS").  In support of his application, he submitted evidence that he was legally admitted to the United States in Miami, Florida, on August 27, 2001, when he was thirteen years old.  This evidence included his visa and Form I-94.[1]

---

[1]  The Form I-94 is a document that provides the arrival and departure record of aliens who are admitted to the United States.

-2-

In August 2011, USCIS denied his application on the basis that his visa and Form I-94 were fraudulent. That same day, Acosta was placed in removal proceedings upon receiving a Notice to Appear ("NTA") from the Department of Homeland Security ("DHS") as an alien "present in the United States without being admitted or paroled." Before the IJ, Acosta argued that he need not show that his documents are authentic to prove that he was admitted to the United States. Rather, the BIA has interpreted "admitted" to include situations where "an alien . . . physically presents [himself] for questioning and makes no knowing false claim to citizenship . . . even though [he] volunteers no information and is asked no questions by the immigration authorities."[2] Matter of Quilantan, 25 I. & N. Dec. 285, 293 (BIA 2010). Emphasizing his young age at the time of his alleged admission in 2001, Acosta asserts that he was unaware that his documents were fraudulent.

**A. Acosta's Evidence**

Acosta appeared twice for hearings before the IJ, in July and October 2012. To support his argument that he was admitted to the United States, Acosta submitted affidavits from himself, his father, and his uncle, and Acosta testified during the July hearing. At the hearing, he explained that he had entered

---

[2] Neither party disputes this interpretation of "admitted."

-3-

the United States, at the age of thirteen, on August 27, 2001. According to Acosta's testimony, his uncle and primary caretaker at the time, Julio César Acosta-Salinas ("Julio César"), had obtained a visa and passport for him. Julio César later escorted Acosta to the airport in Medellín, Colombia. There, Julio César met with a man identified in Julio César's affidavit as the travel agent responsible for providing Acosta's travel documents.[3] Acosta testified that he then bid farewell to his uncle and met a female airline attendant who accompanied him onto the plane. During this process, he at no point had possession of his passport; rather, the airline attendant was responsible for his travel documents. Julio César's affidavit largely corroborates this testimony.

Acosta stated that he landed in Miami that afternoon. Upon arrival, the airline attendant escorted him to an immigration official and gave the official Acosta's documents for inspection. Acosta was not questioned by the official, who communicated with the airline attendant instead. Another airline attendant then accompanied Acosta on a flight from Miami to Boston, Massachusetts.[4] Acosta stated that, after he landed in Boston,

_____

[3] As discussed herein, Acosta did not mention this individual in his affidavit.

[4] Whereas Acosta's testimony from his direct examination seems to suggest that the same flight attendant accompanied him from Medellín to Miami and then from Miami to Boston, during his cross-examination and in his affidavit, Acosta stated that a different

-4-

his father, Omar Alberto Acosta-Salinas ("Acosta, Sr."), who was residing in Massachusetts at the time, greeted him at the airport. Acosta testified that the flight attendant held his travel documents on the second flight and gave these papers to his father upon their arrival. Acosta, Sr.'s affidavit is consistent with this testimony.

Acosta avers that he has not left the United States since his arrival in 2001. Acosta testified that he first learned that his travel documentation was fraudulent when he met with USCIS to discuss his application for permanent residence. Following the hearing before the IJ, Acosta submitted a supplemental memorandum indicating that he took a favorable polygraph examination that corroborated his account of being inspected and admitted to the United States in Miami in August 2001.

## B. The Government's Evidence

The Government sought to show that Acosta was not admitted to the United States in 2001 through the testimony of two expert witnesses, Robert Murray, an Enforcement Officer with United States Customs and Border Protection, and Heather Hoover, a forensic document examiner.

---

flight attendant escorted him on his second flight. While we note this discrepancy, it has no bearing on our decision today.

**Murray's Testimony**

Murray testified that he searched DHS's systems and found no record of Acosta's original Form I-94, which "would suggest that the document was not lawfully issued." He explained that, typically, after an alien is admitted to the United States, his Form I-94 is sent to a centralized processing center and manually entered into the system. He also acknowledged that a Form I-94 could be lost before being entered into the system.[5]

Reviewing Acosta's visa, Murray determined that the visa number was valid but that it was associated with a different individual who entered the United States in November 2001. When asked how Acosta's name and biographical information were transposed onto the visa, Murray reasoned that the visa may have been "washed," a process by which biographical data is removed from the visa and new data reprinted. Based on his analysis of Acosta's visa and his understanding of DHS systems, Murray attested that he did not believe there is "any plausible way" that Acosta

---

[5] Acosta testified that, at some point during these proceedings, he applied for a replacement Form I-94. The Form I-94 sent by immigration authorities indicated that he entered the United States on August 7, 2000. Acosta could not account for the discrepancy in entry dates. Murray testified that the Form I-94 was associated with another individual by the name of Jhonatan Acosta, who is a citizen of Mexico. Murray described this mistake as "a clerical error."

could have used this visa to be inspected or admitted to the United States.

Murray also reviewed a May 2002 visa application for Acosta created in Bogotá, Colombia, and submitted to the State Department. The record reveals that the application was refused on May 29, 2002. On direct examination, Murray stated that, to the best of his knowledge, Acosta would have needed to be present in Colombia in 2002 to apply for the visa. On cross-examination, however, Murray conceded that he did not know whether a thirteen- to fourteen-year old individual would have been required to appear in person to apply for a visa in 2002.

### Hoover's Testimony

Hoover testified that the admission stamps on Acosta's Form I-94 and passport were counterfeit based on an analysis of the ink. She noted that the stamp typically used on Form I-94s should flash under ultraviolet light and that the stamp on Acosta's form had no such ultraviolet reaction. Similarly, Hoover explained that the stamp on Acosta's passport, when viewed under ultraviolet light, suggested that "the fluorescing feature of this stamp was simulated by brushing or placing a substance on top of the stamp impression to give it the appearance of fluorescing."

Hoover also attested that Acosta's visa was a genuine visa that had been modified. The visa number, which is impressed

-7-

into the paper, was unaltered. The original biographical information, however, would have been imprinted in black toner ink which "rests on top of the document" rather than being absorbed into the paper. Accordingly, visas such as Acosta's are "susceptible to being washed." Using an infrared light, Hoover could detect previous entries under Acosta's information. Based on this analysis, Hoover testified that Acosta's biographical data had been printed onto the visa after the previous information was erased.

## C.  The IJ's and BIA's Decisions

The IJ determined that Acosta had failed to establish that he is lawfully present in the United States following a prior admission. 8 U.S.C. § 1229a(c)(2). The IJ acknowledged that Acosta's testimony was corroborated by the affidavits of Acosta, Sr. and Julio César. But he declined to give any weight to Acosta's polygraph examination and noted an "internal discrepancy" between Acosta's testimony and affidavit: whereas Acosta testified that Julio César had met a gentleman outside the airport, he made no mention of this individual in his affidavit.

Ultimately, the IJ was persuaded by the Government's argument that Acosta was not admitted to the United States. He credited the Government's evidence that Acosta's visa had been used to enter the United States in November 2001, which suggests

that Acosta could not have used this visa to enter the United States three months earlier, in August 2001. The IJ also acknowledged a report submitted by Hoover in which she observed that the "2001" in the United States Consulate Bogotá stamp on Acosta's passport had been changed from "2002." This evidence corroborated the Government's argument that Acosta had applied for a visa in 2002, and not 2001, and that he therefore was in Colombia in 2002 (although the IJ acknowledged that there was some uncertainty as to whether an individual of Acosta's age would have needed to appear in person to apply for a visa). In addition, the IJ credited the Government's evidence that the admission stamps on Acosta's Form I-94 and passport were counterfeit and therefore did not indicate whether Acosta had been inspected and admitted. Based on this evidence, the IJ determined that Acosta had failed to demonstrate that he was inspected and admitted to the United States on August 27, 2001.[6]

Acosta appealed the IJ's conclusion that he was removable to the BIA. The BIA affirmed the IJ's decision. Providing a thorough overview of the Government's evidence, the BIA concluded that the IJ had not clearly erred in finding Acosta's

---

[6] The IJ also determined that Acosta was statutorily ineligible for an adjustment of status under INA § 245(a) and failed to meet his burden of proof in demonstrating that he merits voluntary departure. Neither of these conclusions are at issue on appeal.

testimony not credible. Further, the BIA found no error in the IJ's decision to accord no weight to Acosta's favorable polygraph test, noting that such a determination was within the IJ's discretion. Acosta now petitions for judicial review under 8 U.S.C. § 1252(b)(2).

## II. **Analysis**

### A. **Standard of Review**

"[W]e review the agency's factual findings, including credibility determinations, under the deferential substantial evidence standard." Jabri v. Holder, 675 F.3d 20, 24 (1st Cir. 2012). Under this standard, we "uphold[] that decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Mihaylov v. Ashcroft, 379 F.3d 15, 17 (1st Cir. 2004) (quoting INS v. Elías-Zacarías, 502 U.S. 478, 481 (1992)). Where "the BIA has written separately while deferring to and affirming the decision of an IJ, we review both the BIA's decision and the relevant portions of the IJ's decision." Kartasheva v. Holder, 582 F.3d 96, 106 (1st Cir. 2009) (quoting Lutaaya v. Mukasey, 535 F.3d 63, 70 (1st Cir. 2008)).

### B. **Adverse Credibility Determination**

Under INA § 212(a)(6)(A)(i), "[a]n alien present in the United States without being admitted or paroled . . . is inadmissible." 8 U.S.C. § 1182(a)(6)(A)(i). Here, Acosta bears

the burden of establishing, by clear and convincing evidence, that he is lawfully present in the United States following a prior admission.  Id. § 1229a(c)(2)(B).

Acosta contends that the IJ erred in determining that Acosta's testimony was not credible and giving inordinate weight to Murray's and Hoover's expert testimony.[7]  To be sure, "[a]n alien's credible testimony, standing alone, may sustain his burden of proving eligibility for withholding of removal.  But evidence that the factfinder supportably characterizes as incredible may be either disregarded or discounted."  Pan v. González, 489 F.3d 80, 86 (1st Cir. 2007) (citation omitted).  Here, the IJ's and BIA's determinations were based on considerable evidence regarding the validity of Acosta's travel documents:  indeed, "[t]he IJ did not deal in broad generalizations but relied on a specific and well-articulated litany of identified inconsistencies in the petitioner's story."  Id.  This evidence included substantial testimony and reports suggesting that Acosta's travel documents

---

[7]  As the IJ noted, the REAL ID Act, Pub. L. No. 109-13, § 105(d)(2)(4)(C), 119 Stat. 231, 304 (2005), applies here because Acosta's application was filed after the effective date of the Act.  Kartasheva, 582 F.3d at 104 n.7.  "Under the Real ID Act, a trier of fact may base an adverse credibility determination on any inconsistency in the record that has a bearing on the petitioner's veracity, 'without regard to whether the inconsistency goes to the heart of the applicant's claim.'"  Jabri, 675 F.3d at 24 (alterations omitted) (quoting 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1231(b)(3)(C)).

were falsified, as well as information that directly contradicted Acosta's claim that he entered the United States in August 2001, including a 2002 visa application and evidence that another individual used his visa to enter the United States in November 2001.

Nor has Acosta "provide[d] a meritorious explanation for the inconsistencies." Conde Cuatzo v. Lynch, 796 F.3d 153, 156 (1st Cir. 2015). The IJ and BIA did not err in disregarding Acosta's unsubstantiated argument that these many inconsistencies were due to administrative error. Indeed, the IJ gave Acosta an additional opportunity to explain the inconsistent documentation. Following the October hearing, the IJ had the government locate the immigration official associated with the stamp number on Acosta's Form I-94 to confirm that the official was not involved in smuggling or any other wrongdoing. Only after the Government found this official, who submitted an affidavit averring that he had not engaged in misconduct and did not recall admitting Acosta in 2001, did the IJ issue its decision.

Acosta faults the IJ and BIA for considering his inconsistency in testifying that his uncle met a man from the travel agency at the airport but omitting this individual from his affidavit. Standing alone, such an inconsistency likely would be insufficient to support a finding that Acosta was removable. See

Jabri, 675 F.3d at 25 (remanding where inconsistencies identified by the IJ were "not direct inconsistencies"); Kartasheva, 582 F.3d at 106 (remanding where the petitioner "did not change her story during the asylum interview but simply omitted small details"). But the IJ did not err in considering an otherwise minor inconsistency in the broader context of substantial evidence that Acosta's documentation was fraudulent. See Pan, 489 F.3d at 86 ("Some of these inconsistencies, in isolation, may seem like small potatoes. What counts, however, is that their cumulative effect is great.").

Acosta also contends that, having entered the United States at thirteen, he cannot explain how he was admitted using these documents and asserts that his own testimony, consistent with his father's and uncle's accounts, should carry the day. This court is sympathetic to Acosta's argument. The events at issue took place when Acosta was only thirteen, and his testimony, along with that of his uncle and father, suggest that he was not responsible for his travel documentation. But Acosta's age at the time of entry cannot relieve him of his burden of showing that he was admitted to the United States, and -- as the IJ and BIA noted -- his failure to explain the holes in his story is fatal to his claim.

## C. Favorable Polygraph Examination

Next, Acosta faults the BIA for summarily affirming the IJ's decision to disregard his favorable polygraph examination. Acosta's argument is without merit. The BIA provided a reasoned explanation for its determination that the IJ did not err in weighing the polygraph evidence, noting that the IJ "was in the best position to observe the respondent and make determinations regarding his credibility." The BIA also explained that decisions as to the weight of the evidence fall well within the IJ's discretion.

This reasoning is well-supported under our law. As the BIA noted, the IJ has "broad discretion over the conduct of immigration court proceedings." Condo Cuatzo, 796 F.3d at 156. And while a due process violation may arise from an IJ's decision to exclude evidence, "the trial judge must be accorded some flexibility in his efforts to ensure that speculation and surmise do not become proxies for probative evidence." Pulisir v. Mukasey, 524 F.3d 302, 311 (1st Cir. 2008). Polygraph results have long been considered of dubious value, and the IJ did not err in declining to give Acosta's polygraph examination any significance in his weighing of the evidence. Cf. United States v. Rodríguez-Berríos, 573 F.3d 55, 73 (1st Cir. 2009) ("Polygraph results are rarely admissible at trial."); deVries v. St. Paul Fire & Marine

-14-

<u>Ins. Co.</u>, 716 F.2d 939, 944-45 (1st Cir. 1983) (finding that the district court did not err in granting motion to exclude evidence regarding the refusal to take a polygraph as "polygraph evidence has long been considered of dubious scientific value").

### III.  Conclusion

Standing alone, Acosta's testimony, corroborated by affidavits from his father and his uncle, supports his version of events that he was admitted to the United States in Miami in 2001. But Acosta has failed to explain the many inconsistencies in his travel documentation, and neither the IJ nor BIA erred in crediting the Government's substantial evidence rebutting Acosta's own account.  The petition is denied.[8]

**Denied.**

---

[8]  We nevertheless believe that this petition presents an instance where the Government should consider whether to exercise its prosecutorial discretion to avoid the harsh result that Acosta now faces.  Although the law compels us to deny Acosta's petition, we note our discomfort with this result.  The IJ himself noted that the Government "seem[ed] to be spending a lot of effort regarding the entry of a 13-year-old in the United States" and asked why DHS had devoted so much energy to this case.  We too question the Government's commitment to ensuring that Acosta, who has a clean record and has formed a family here since his arrival over a decade ago, can likely never return to his adopted home.  While it need not take our suggestion, we encourage the Government to reconsider its position in this case.